## PROCESS ENGINEERS, Inc., v. CONTAINER CORPORATION OF AMERICA.

### No. 5064.

Circuit Court of Appeals, Seventh Circuit.

March 19, 1934.

Rehearing Denied May 18, 1934.

Albert G. McCaleb, Casper William Ooms, and Warren C. Horton, all of Chicago, Ill., for appellant.

Clarence E. Mehlhope and E. A. Wagonseller, both of Chicago, Ill., for appellee.

Before ALSCHULER, EVANS, and FITZHENRY, Circuit Judges.

Appellant's patent No. 1,589,947 covering a process of making paper is involved on this appeal. The court found the patent invalid and dismissed the suit.

EVANS, Circuit Judge.

The art of making paper, to which this patent relates, is very old, and the various

inventions and discoveries which mark its advance need not be here detailed. It is sufficient to say that, generally speaking, paper is made of a composition of vegetable fibers matted together into sheets. The cellulose fibers are derived from a multitude of products, including cotton, straw, rope, linen rags, and various kinds of trees. To more adequately adapt the paper to its different uses, it is necessary to introduce non-fibrous material. The present patent covers a process which aims to overcome the absorptive nature of paper making fibers. In other words, in order to make the paper water and ink resistant, the manufacturer uses a process called sizing. It is to the paper sizing art that the patent in suit relates.

Claims 1 and 2, here involved, read as follows:

"1. A method of sizing paper, which consists in adding the size and alum to the paper stock after the fibers of said stock have passed through the Jordan.

"2. A method of sizing paper, which consists in adding a size solution to the paper stock after said stock has been treated by the Jordan."

To understand the meaning of the words used in the claims, a brief description of the machines used in making paper is necessary.

We adopt appellant's description of these machines.

"Before the cellulose fibers from which paper is made can be matted together into sheets it is necessary to break them down from the forms in which they are found and to separate them from each other. This is done in breaking or mixing machines called beaters. (The beater was invented in Holland in 1750, and is sometimes called a Hollander.) The beater consists of a large oval tub equipped with a roll of large diameter which is shod longitudinally with metal blades. This roll rotates at speeds ranging from 100 to 125 r.p.m. over a bed plate in which other blades are imbedded and can be adjusted in its position with respect to the blade.

"The beater is a batch mixer with a capacity from a half ton to a ton of fibers mixed with many times as much water. This mixture of fibers and water, called pulp, is circulated around the trough of the beater by blows from the beater roll, and during this operation the sizing, coloring and filling materials are mixed with the pulp. When suitably conditioned in the beater, sized and colored, the pulp is diluted with approximately an equal quantity of water and is then drained into a large chest from which it is pumped to a refining engine or Jordan, which reduces the fibers to the desired length and fineness. The Jordan refiner is conical in shape with a tapered plug which revolves at a speed of 450 r.p.m. against the inner wall of the tapered shell. Both plug and shell are equipped with bars or knives which refine the pulp as it passes continuously through the Jordan.

"From the Jordan the refined pulp, which then has the desired characteristics for making it into a sheet of paper, flows into the machine chest where it undergoes further mixing, and from the machine chest the pulp is pumped to the paper machine, an enormous machine in which pulp is transformed into paper.

"At the wet end of the paper machine the pulp flows to a screen composed of fine slits to remove coarse physical impurities. In order to allow the pulp fibers to pass through this screen, the mixture is further diluted at this stage with a large volume of water.

"This diluted pulp, containing about one per cent solid matter, then flows on to a moving wire cloth belt or cylinder through which the water is drained, and which felts the fiber into a continuous web of paper. This web is carried over heated cylinder rolls which remove the remainder of the water in the sheet by evaporation. The web then passes through a series of heavy solid rolls which polish the paper. The finished paper is then reeled into rolls in which form it is taken from the paper machine."

As this patent is restricted to the sizing of paper, which is accomplished by the introduction of sizing agents into the pulp, the issue before us becomes a narrow and simple one as soon as the terms and the old practices are understood. The sizing ingredients are two, viz., rosin soap, called size, and sulphate of alumina, called alum. The action of these two chemicals on each other in the pulp mass results in the sizing. In view of the defense, it is unnecessary to describe in detail the chemical effect of one ingredient upon the other. The asserted novelty of both claims is limited to the time or place when the sizing ingredient is introduced. Claim 1 calls for the size and alum to be introduced "after the fibers have passed through the Jordan." Claim 2 calls for the introduction of the size solution after the stock has been treated by the Jordan.

The validity of the two claims is attacked on the ground that the introduction of the chemical ingredients after the stock has

passed through the Jordan was old and therefore was not taught by the patentee, De Cew. It is likewise contended that the prior art, evidenced by patents, was such as to prevent appellant from successfully asserting that the advance of the patent was invention. Appellee also denied infringement.

The court found, among other things:

"The general practice is and has been for a long time prior to the patent in suit, to apply the alum and sizing solutions at the beater engine.

"However, for a long time prior to the patent in suit, it had been known

"(a) to apply the size and alum solutions after the operations of all the reducing engines and at or prior to the paper making machine 'with the water with which the pulp is diluted previous to or when supplied to the paper making machine';

"(b) to apply the size and alum solutions after the reducing engine, as (at) the beater engine, and water has been added in a separate chest, wherein the two sizing elements are thoroughly mixed with the 'furnish' by means of lightly operating frictionless mixing devices;

"(c) to apply the size and alum solution as it passes into the Jordan engine;

"(d) to apply the size and alum solution into the discharge end of the Jordan engine and after the reducing action of said engine is practically completed; and

"(e) to apply the size solution to the 'furnish' in advance of the Jordan engine and to apply the alum solution to the 'furnish' after the Jordan engine and in immediate advance of the paper making machine.

"In substance, every point in the order of application of size and alum solutions to the furnish in its path from the refining engines or engine to the paper machine, whether or not a beater engine and Jordan engine, either or both in the usual succession, were used, had been known and described or used long prior to the patent in suit. * * *

"The order or point of application of the size and alum to the furnish, at or near the paper machine, after the final reduction of the fibres by any and all of the refining or reducing engines employed and where the furnish was diluted previous to or when supplied to the paper machine, as charged to be used by the defendant, was old long prior to the patent in suit. * * *

"Conclusions of Law.

"Every claim of the patent is old in the prior art and is lacking in patentable novelty."

It is urged that the court's findings should be sustained because supported by some evidence. The weakness of this argument lies in the fact that the findings were not made by the court, but are the work of industrious counsel who combined his argument and a partisan and unfair statement of facts into one and called it, "Findings of Fact." It is difficult to distinguish these findings from the brief of counsel for appellee.

Such so-called findings do not help an appellate court. They reflect the views of counsel who submitted them and detract from the force and effect which are ordinarily given to findings made by the trial judge. When the abuse is aggravated (and the objectionable practice is growing), the assistance to the appellate court, which findings when carefully made by the trial court afford, is lost, and it becomes necessary for us to study the evidence as though no findings had been made by the District Court.

Examining the evidence uninfluenced by any findings, we are led to the conclusion that claim 1 is unquestionably void in view of prior public use. The same conclusion is reached in reference to claim 2, although the evidence is not quite as persuasive as in the case of claim 1. There are also some prior patents and documentary disclosures which tend to restrict the field of operation for the patentee De Cew. Reference will be first made to the art as evidenced by the patents.

In the British patent No. 3306 (1862) to one John Lamb, it is stated:

"In manufacturing tissue paper for transferring patterns and designs on porcelain, or for other purposes, it has heretofore been necessary to apply the size to the surface of the paper before the impression is printed upon it. Now my Invention consists in combining the size with the pulp in the ordinary rag engines or other machinery now employed in preparing the pulp for the paper-making machines, *or in combining the size with the water* with which the pulp diluted previous to or when supplied to the paper-making machines, or in sizing the paper in its progress through the paper-making machines."

There was introduced in evidence a translation of a German publication entitled "Handbuch der Papier-Kunde." This "Handbuch" appeared in 1904. Referring to sizing it said:

"In most mills (the thorough mixing of the stock with rosin size) takes place in the beating engine during the beating, although it is sometimes done only after the beating is finished in special mixing hollanders which do not have any further mechanical action on the fibers but are provided with agitators which impart to the stock a very rapid circulating motion."

In an English patent to Weygang (No. 7904 issued in 1886), the patentee said:

"Instead of completing the entire sizing operation in the beating engine as described similar results are produced by passing the fibrous pulp after the size has been added and thoroughly mixed in the said beating engine into another suitable apparatus fitted with mixing arms or other contrivance capable of mixing the pulp without much friction and adding the alum or other precipitating solution to the pulp in this apparatus. The object being to avoid or lessen the effects of the friction and agitation of the beating roll whilst the sizing matter is being and after it is precipitated."

The Munroe patent, No. 1,335,909, granted by the United States April 6, 1920, refers to the sizing operation as follows:

" * * * After the material is of a desired size and consistency, a proportion of ordinary rosin size not exceeding say 10 per cent is run in and the material is thoroughly mixed. Aluminum sulfate is then run in and thoroughly mixed also, which precipitates free rosin and aluminum resinate on each individual fiber. The material is then introduced into the felting machine, where it is mixed with water to approximately the proportions above * * *."

The Allen & Trimbey patent, No. 1,357,760, issued November 2, 1920 (Reissue No. 15,311), also refers to the sizing of paper.

"The size, alum, and other ingredients in dilute liquid form, can be added to the stream in the trough 20 by either of the arrangements above described for adding clay or color. All these ingredients are delivered in fluid form to the spout 20 which preferably is constructed with a V-shaped bottom, as shown in Figure 2, and in flowing through this trough and through the spout 21, the ingredients become intimately mixed by the interference of the stream lines. The final mixture may either flow by gravity or be pumped to the Jordan chest, machine chests, or other storage chests, as desired."

The testimony of the three witnesses who told of the practices of the Falulah Paper Company is persuasive. Two of these witnesses were disinterested.

The patent in suit was issued June 22, 1926, upon application made September 19, 1925. The practices followed by the Niagara Paper Mills at Lockport, N. Y., were established by two witnesses who described the manufacture, in this plant, of certain film paper made for the Eastman Kodak Company in 1905. They told of the place where the sizing ingredients were inserted. If their story is believed, we must find the patent in suit was anticipated. The testimony of these witnesses, like the testimony of the witnesses who told of the sizing operation in the Falulah Paper Company, is uncontradicted. We feel under obligation to accept it. It follows therefrom that full anticipation of the patent in suit is established.

The decree is affirmed.