## SALES AFFILIATES, Inc. v. NATIONAL MINERAL CO. et al.

### No. 9695.

United States Court of Appeals
Seventh Circuit.

Feb. 7, 1949.

Rehearing Denied March 14, 1949.

City, and James P. Hume, and **Gerrit P. Groen**, both of Chicago, Ill., for appellee.

Before KERNER and MINTON, Circuit Judges, and LINDLEY, District Judge.

LINDLEY, District Judge.

Defendant appeals from a judgment holding valid and infringed Winkel patent 2,051,063, August 18, 1936, and Evans and McDonough reissue patent 22,660, August 7, 1945. It contends that neither patent is valid and that if either is valid, defendant has not infringed.

Each patent has to do with the art of hair curling, especially that involved in creating "permanent" waves. Needless to say, by the very nature of things, this art is of ancient origin. It involves, so far as "permanent" waves are concerned, winding the hair on separate curlers; applying a waving lotion to the curled hair; heating the moistened hair wound about the curlers for a pre-determined period of time and, finally, cooling the hair before removing it from the curlers. An operator practicing the earlier art procured the essential heat from an external source, usually an electric current, thus necessitating the use of relatively complicated apparatus. But the art with which we are concerned progressed a step further by eliminating any external source of heating and providing heat by chemical reaction in material wound about the hair after it had been curled. Thus, Winkel, in the first patent, stated that his objectives were to provide an operation whereby the use of an external heating device is avoided and to supply a permanent waver which does not require any fastening means for maintaining it intact on the hair while the latter is being treated. As interpreted by plaintiff's expert, he provided a hair waving pad which can be used to enclose a preformed tress, the pad being so constructed as to evolve from exothermic chemical within itself sufficient heat to wave the tress, the evolution of the heat occurring as a result of moistening the chemical.

It is undisputed, therefore, that Winkel successfully did away with external means of heating and avoided the use of a metal clamp to hold the hair and waver in place.

Maurice S. Cayne and Casper W. Ooms, both of Chicago, Ill., for appellant.

Geo. B. Finnegan, Jr., Hobert N. Durham, and James J. Dwyer, all of New York

610

This he accomplished by providing in a single unit a backing sheet having a sachet secured adjacent one edge thereof. This sachet, of impervious material, such as metal foil, contains a chemical such as calcium oxide or an oxide compound intended to be combined with a liquid such as ammonium hydroxide to develop heat sufficient to fix the wave in the hair relatively permanently. He attached, also, an apron, to be moistened by the aforesaid ammonium hydroxide, and prescribed that, before wrapping the pad around the curled hair, the sachet containing the chemical be perforated. When the pad is then wound around the hair, next to the hair is the apron, moistened as aforesaid by the ammonium hydroxide; then around this is wrapped the sachet containing the chemical so that the sachet having been perforated, the moisture from the apron generates the heat necessary to effectuate the desired result. When he has thus wound around the curled hair the apron, the sachet and the outer covering, integral in one continuous flexible pad, so that wrapping is facile, he fastens the pad, thus wound around the hair, by twisting the ends of the outside enveloping metal foil above and below the pad on the curler, thereby eliminating any necessity of a clamp and providing, as he said, effective means to prevent the escape of vapors generated by the chemical reaction. This is his alleged invention.

Winkel was preceded in the art by Lackenbach 18,346 and Frederics 1,596,247. Lackenbach claimed a device described as a flexible rectangular absorbent strip containing hair treating substance, adapted to be wrapped about hair wound upon a curler. He attached to the strip a sheet of water-proof material, adapted to be wrapped around said strip after the latter has been rolled about the hair on the curler, so as to form a cylindrical covering for said strip, and an integral tab upon said strip and sheet, the tab being adapted to be folded upon the hair before the rolling operation is commenced.

Frederics, too, described an appliance for creating a permanent wave. He recognized that the first step was to curl the hair about curlers and mentioned that one of the methods previously practiced was to impregnate a strip of absorbent material with a fluid having a tendency to soften the hair under the influence of heat or with a pasty mass of which borax had been the principal constituent part. He described other methods. He pointed out his objection thereto and claimed that he had eliminated alleged defects by providing a device which is proof against the escape of steam through its side walls and prevents hot water from escaping. He claims a device comprising a flat envelope formed of flexible material, one face of which is provided with a plurality of interstices, and has a strip of impervious fire-proof material secured thereto, adapted to be wrapped around the latter to form a cylindrical covering when the envelope is wrapped about a tress of hair upon a curler. But he, too, described and claimed a curling pad dependent upon heat from an external source. The teaching of each of these patentees is pertinent only to the extent that they disclose prior conceptions of curler pads adapted to be wrapped about the hair before heat is applied.

Sartory 1,565,509 likewise preceded Winkel. In this patent we find for the first time the idea of elimination of heat from an outside source and the conception of a pad containing a sachet or envelope in which is inserted a chemical, which, when subjected to moisture, will generate the necessary heat. His application was filed in 1924 and the patent issued December 15, 1925. Sartory stated as one of his objectives, the provision of a heater in which the heat required for the steaming operation was to be obtained by exothermic reaction by placing a chemical substance in the sachet container upon which water was to react to produce the heat requirement. This chemical was placed in the heater during manufacture and the water brought in contact with the chemical substance at the time of the curling operation. He specified a stratum of chemical material which would react exothermically with a liquid reagent. He applied water to the heating pad by enveloping the latter in cotton, wool or any like fibrous material which can be saturated with water. His pad, therefore, had an inner annular layer of chemical material and an outer layer of fibrous material. This

was wrapped around curled hair as in Winkel.

█ The difference between the two patents lies almost entirely upon one fact. Sartory placed his moistening element outside of the heating element while Winkel placed his on the inside. To our minds in this distinction lies all vital differences between the present parties. It seems quite clear to us that the object and purpose of Sartory was exactly the same as that of Winkel,—first, to avoid an external source of heat and the necessary machinery supplying the same; second, to supply, in lieu of such external source of heating, a pad containing chemical of such character as, when brought in contact with water, would result in a chemical reaction generating the necessary heat. Each of the patentees had this conception; each of them taught it; each of them applied it. In their respective conceptions, they differed only as to the relative orders of application of the heating element and the moistening element. One placed the moistening element on the outside; the other placed it on the inside. Thus it is clear that Winkel was not a pioneer worker in the art. He had before him the teaching of construction of proper hair curling pads in earlier patents and the explicit teaching of Sartory of a properly constructed pad containing an element not found in the earlier art, that is, the chemical element supplied to generate the heat. If Winkel improved upon Sartory, he did it only by changing the relative position of the two elements and in his deft preparation of the ensemble. Reduction of weight of the pad or making it more compact or more easily handled is not invention; these are merely the product of skill in the art. Altoona Publix Theatres v. American Tri-Ergon Corp., 294 U.S. 477, 55 S.Ct. 455, 79 L.Ed. 1005; National Pressure Cooker Co. v. Aluminum Goods Mfg. Co., 7 Cir., 162 F.2d 26; Cuno Corp. v. Automatic Devices Corp., 314 U.S. 84, 62 S.Ct. 37, 86 L.Ed. 1516.

We have examined the record carefully and we are unable to find anything in the evidence indicating that in this slight variation, Winkel accomplished anything in the way of invention. Indeed we do not find any change by Winkel that amounted to improvement of any character. As the Court of Appeals for the Second Circuit said in Zotos Corp. v. Rader, 91 F.2d 935, 937: "It (the plaintiff) says that the art for over a quarter of a century had needed an effective chemical waving pad; and yet, though every element had been known—all the tools so to speak had been at hand—not until Evans had the insight to combine them, had satisfaction come. The result was immediate success. This reasoning disregards the facts. Evans did not invent the curling pad; Sartory did."

This conclusion seems inevitable to us upon comparison of the respective disclosures of Sartory and Winkel, quotations from each of which appear in the footnote.[1]

---

[1] Sartory Pat. No. 1.565,509. (December 15, 1925) "This invention relates to a process of curling and waving human hair on the head." (Page 1, Lines 10, 11.)

" * * * to provide means for obtaining and applying chemical heat to the hair under treatment." (Page 1, Lines 12-14.)

"According to this invention the heat developed by the reaction of calcium oxide or other suitable material or materials with water or other liquid reagent is utilized to effect the required heating and steaming of the hair under treatment in processes of curling and waving hair." (Page 1, Lines 17-24.)

" * * * thus dispensing with the use of the various electrical and other heating devices hitherto employed." (Page 1, Lines 14-16.)

"Figs. 3 and 4 being, respectively, longitudinal and cross-sectional views showing the pad applied to a coiled tress of hair, and enclosed in a steaming tube together with an absorbent pad for applying moisture to the heating pad. * * *" (Page 1, Lines 85-90.)

Winkel Patent in Suit (August 18, 1936.) "This invention relates to new and useful improvements in means for and method of permanently waving hair." (Page 1, Col. 1, Lines 1-3.)

" * * * to provide a hair waving device wherein a chemical reaction is utilized for creating a vapor of sufficient heat to permanently wave the hair." (Page 1, Col. 1, Lines 6-9.)

" * * * to provide a permanent hair waving device wherein means are provided for completing the operations required in the waving of hair without the application of external heating devices." (Page 1, Col. 1, Lines 10-14.)

Perhaps we should refer briefly to another inventive element claimed by Winkel, namely; that of having a metal foil backing for the pad, the ends of which can be twisted over the tress of hair being curled and over the heating pad at the upper and lower ends thereof so as to prevent escaping vapors. This, Winkel said, eliminates the necessity of a clamped container. It may well be that in the operation here involved, it is preferable to have a flexible material of the character prescribed by Winkel rather than the original comparatively light container clamped on over the curling pad. But again this is choice of means open to the skilled operator, in which we do not believe invention lies.

■ We conclude that the record is devoid of evidence to support a finding of validity of the Winkel patent.

■ Evans et al., Reissue 22,660, contains claims of a compound of materials for generating an exothermic reaction when water is added and claims for the method involved in treating hair with the heat thus generated. Certain claims recite in functional terms the five elements prescribed by the alleged invention. Plaintiff's expert witness testified that the patent calls for "five separate types of materials" to be placed in the curling pad, in addition to the added water, namely, "an oxidizable material, a reducible material, a hydrogen-ion control material, an electron transfer material and a water absorbent diluent material."

We think complete anticipation exists in the prior Baker patent, 1,760,102. It seems clear that every one of the claims for the compound of matter for generating heat reads upon the composition disclosed by Baker. Each patentee prescribes an electron losing material, such as aluminum. Each includes an electron accepting material. Thus the reissue patent includes persulphates and chlorates and Baker, potassium chlorate. Each calls for a solid material to give proper hydrogen-ion concentration. In this connection the reissue patent calls for a small amount of strong acid and a large amount of weak acid or acid salts such as bisulphates, bitartrates or chlorides, while Baker prescribes copper sulphate, sodium chloride or calcium chloride. Each specifies a copper containing material to form nascent metallic copper and copper ions upon addition of water to the mixture. Thus the reissue prescribes an oxide or salt such as copper oxide, and Baker, copper sulphate. Each includes an inert solid absorbent, the reissue patent mentioning clay and Baker sawdust. The record discloses that the respective prescriptions are equivalents; thus copper sulphate is a salt formed of a strong acid and a weak base and constitutes a substance supplying proper hydrogen-ion concentration. Sodium chloride has practically the same properties as ammonium chloride. Calcium chloride is a salt formed of a strong acid and a weak base and it too, is a solid material which will supply proper hydrogen-ion concentration. Other evidence in the record corroborates the fact that the respective compounds are equivalents.

Plaintiff contends that sawdust is not a proper inert element in this kind of set-up, as there might be danger of explosion. Of course, this would be obvious to one skilled in chemical science and suggest substituting truly inert material for the so-called inert sawdust. Clearly the substitution of clay did not rise to the dignity of invention.

■ But says plaintiff, Baker was dealing in a non-analogous art, as he was prescribing a composition for a body-warming pad. But Baker made it clear that what he was claiming was a heating pad based on an exothermic oxidation-reduction reaction. A chemical heating pad used for body warming is one example of the general art of heating mixtures; a chemical heating pad for hair waving is only another specific example of that general art. This the reissue patentees recognized when they said that their invention relates generally to the art of chemical heaters.

The Supreme Court had occasion to pass upon a similar question in Mandel Bros., Inc. v. Wallace, 335 U.S. 291, 69 S.Ct. 73. The court held that a patent for improvement of a cosmetic preparation intended to retard or inhibit perspiration by adding urea to the old salt cosmetics was invalid

in view of the prior use of urea as a corrosion inhibitor in compositions used to protect fabrics in dry cleaning or finishing fabrics and that the specified use was only one specific application of recognized principles in a particular situation. Similar in intent are the decisions in Brown v. Piper, 91 U.S. 37, 23 L.Ed. 200; Frederics v. Eugene, Ltd., 2 Cir., 3 F.2d 543; Jay et al. v. Weinberg, 7 Cir., 262 F. 973. In the Mandel case, this court had thought that when the patentee found that addition of urea to his perspiration inhibitor would perfect it so that it would protect the clothing and skin of the wearer from irritating effects formerly existing and no one in the immediate prior art had discovered this fact, invention resulted. We held that prior uses of urea in a dry cleaning solution or in a compound used in finishing fabric were so far afield as not to be prior art references as against the patentee, who was interested only in perspiration inhibiting compounds. But the Supreme Court disagreed. We think the only fair conclusion, under that decision, is that, in the present case, Baker and the reissue patentees were both dealing with the same scientific creations, that is chemical generating heaters, and that the reissue patentees did not achieve invention by making specific application of the art to hair curling pads when it had been taught generally. What we have said in this connection disposes of the method claims also.

 Under the federal rules we are not at liberty to review a finding of fact of the District Court unless it is "clearly erroneous." Here the question of whether the patents are valid or invalid depends entirely upon an analysis of prior patents and a comparison of what is taught by them and what is taught by the patentees in the two patents in suit. This is not a case where the findings of fact depend upon disputed evidence or controverted facts but is rather one where the ultimate findings depend upon whether recorded prior art is such that the patentee has achieved invention over and above the same. In such a situation, we think that the decision of the Supreme Court in Sanitary Refrigerator Co. v. Winters, 280 U.S. 30, 31, 50 S. Ct. 9, 74 L.Ed. 147, is directly in point.

See also Singer Company v. Cramer, 192 U.S. 265, 24 S.Ct. 291, 48 L.Ed. 437; Uihlein v. General Electric Co., 8 Cir., 47 F.2d 997, and Process Engineers v. Container Corp., 7 Cir., 70 F.2d 487.

Defendant has presented a motion to remand for the reception of what is said to be newly discovered evidence. In view of our conclusion, action upon this motion is no longer necessary and it is, therefore, denied. In view of what we have said concerning the merits, it is not necessary to comment upon other points argued for reversal.

 There remains a question of costs. After this appeal had been taken, defendant filed with this court a petition for an injunction against plaintiff from circulating certain correspondence; this we denied. Counsel for plaintiff have now moved that we tax as costs, against defendant, plaintiff's counsel's fee and expenditures incurred in defending that petition. The order was that the petition be denied at the costs of the petitioner. Plaintiff contends that the court is permitted to tax these items as costs because of the provision of U.S.C.A., Title 35, Patents, Sec. 70, that: "The court may in its discretion award reasonable attorney's fees to the prevailing party upon the entry of judgment on any patent case." The applicability of this statute is not apparent. The proceeding with which we are directly concerned on this motion was merely an interlocutory petition for injunction which was denied. We doubt that such a proceeding comes within the terms of the statute. However, it has sometimes been said that a court of equity may award counsel costs and fees without specific statutory authority. Franz v. Buder, 8 Cir., 38 F.2d 605. But, if this is correct as a matter of law, the circumstances must be such as to justify a court of equity in so acting. In other words, even if this court, as a court of equity, may within its discretion, as an exception to the general rule, if the circumstances justify, allow the recovery of counsel's fee and expenses, it must be remembered that such action is extraordinary in character allowed only when the equities of the cause appeal strongly to the chancellor. Under the rule announced by the Su-

preme Court in Kansas City S. R. Co. v. Guardian Trust Co., 281 U. S. 1, 50 S.Ct. 194, 74 L.Ed. 659, we conclude that the circumstances here are not such as to justify us as a court of equity in allowing any such unusual and extraordinary remedy. The motion to include as taxable costs, counsel's fees and expenditures, is denied.

The judgment is reversed with directions to proceed in accord with this decision.