## GENERAL TIME CORP. v. HANSEN MFG. CO.

No. 10564.

United States Court of Appeals
Seventh Circuit.

Oct. 9, 1952.

Paul H. Schmidt, Evansville, Ind., W. Brown Morton, H. H. Hulse, New York City, Raymond B. Canfield, New York City, of counsel, for appellant.

Ralph G. Lockwood, Indianapolis, Ind., Isidor Kahn, Evansville, Ind., Harold R. Woodward, Lockwood, Galt, Woodard & Smith, Indianapolis, Ind., Harry P. Dees, Kahn, Dees, Donovan & Kahn, Evansville, Ind., for appellee.

Before KERNER, FINNEGAN and LINDLEY, Circuit Judges.

LINDLEY, Circuit Judge.

Having been accused of infringing defendant's patent to Hansen et al. No. 2,-298,373, applied for April 25, 1940, issued October 13, 1942, plaintiff brought suit against defendant praying for a declaratory judgment that no valid claim of the patent had been infringed by plaintiff's manufacture and sale of certain types of synchronous electric clock motors. Defendant filed a counterclaim charging plaintiff with infringement of Claims 4, 9, 10 and 11,[1] of the Hansen patent. The court found validity, adjudged plaintiff guilty of infringement and directed an accounting. Upon appeal plaintiff insists that the patentees disclosed nothing of patentable novelty over the prior art.

In their application, Hansen and his associate said that their invention relates to electric "synchronous motors such as employed for operating clocks," and directed attention to what they asserted was a defect in the prior art in that in one type the "pole pieces of opposite polarity are brought close together so as to provide a relatively low reluctance path for leakage flux," and added that, in this type of motor, "the rotor intercepts only that 'flux' which does not pass through the path of low reluctance." In still another type, they said, the "pole pieces which extend laterally or axially of the motor are taken alternately from opposite sides of the energizing coil and consequently of opposite polarity." They commented that motors of these two types had been found satisfactory but asserted that they had discovered that a still better motor "is obtained by eliminat-

1. Claim 9 is typical of the claims in suit and reads as follows: "In a synchronous motor, a magnetic core, a magnetic field member mounted on one end of said core and having outer pole pieces disposed axially in a substantially cylindrical path, said pole pieces being arranged in pairs with a greater angular distance between pairs than between the pole pieces of each pair, a second magnetic field member mounted on the other end of said core and having inner pole pieces disposed radially with their tips spaced from the tips of the axial pole pieces to leave a continuous annular opening between the pole tips, said inner pole pieces being arranged in pairs with a greater angular distance between pairs than between the pole pieces of each pair, a rotor positioned within said annular opening and means for producing a magnetic field in said field members."

ing all or substantially all of the leakage flux and causing this flux to be intercepted by the rotor." They asserted that it was not necessary that the adjacent or alternate axial or lateral poles be of opposite magnetic polarity but that, instead, they "may be formed in pairs of poles all of which have the same polarity." They prescribed a "field structure," consisting of "two spaced poles from opposite ends of a field core, the inner set consisting of a disc with radially projecting fingers and the outer set consisting of a disc with axially projecting fingers, the tips of the two sets of fingers being spaced sufficiently wide apart to eliminate substantial leakage of flux and yet close enough to a rotor as to cause practically all of the flux passing between the poles to go through the rotor." All their proposals were directed to their general object to provide "a slow speed synchronous motor in which practically all of the flux or magneto motive force generated by the exciting coil is employed either in starting the rotor or thereafter causing the rotor to revolve at synchronous speed." From their own statements, therefore, the applicants believed that they had produced a combination of old elements possessing the new quality of being able to eliminate or reduce the leakage of magnetic flux and thus to achieve a stronger starting torque as well as a relatively high operating torque.

Motors of the general character of that described in the patent and others similar thereto, manufactured by plaintiff, defendant and others, operate on an alternating current of electricity at a speed determined by the latter's frequency, which, in the modern electric plant, is maintained at a constant rate. Such motors have been in use for many years and generally consist of two types, the offset coil type, wherein the coil which is energized by the current is offset with respect to the rotor shaft, and the axial coil type wherein the center of the coil is in axial alignment with the rotor shaft. Both types are old and the worker in the art had the choice of the two arrangements. The patentees employed an axial coil type.

In a simplified form of such a motor, the two poles are separated and shaped to a curvature concentric with the outer rim of the rotor so that the pole faces are closely adjacent to the rotor but out of contact with it. One part of each of the poles is shaded, that is, it is encircled at its base with a number of copper wires, the purpose of which, as taught by the art, is to retard the build-up of magnetism in the shaded part as compared with that in the part which is not shaded, resulting in the production in the poles of a so-called rotating field; that is to say, the magnetic force moves from pole to pole progressively in one direction or at another depending upon which part of the separated poles is shaded.

The poles are made of iron, which is comparatively permeable to the magnetic flux generated by the coil. However, such poles will retain the flux only during the instant when the current flows through them. The rotor is made of steel possessing the property of retaining the magnettism. When the current passes through the coil it creates in the magnet resulting from these qualities a "magnetic flux," producing at one pole a "north" polarity and at the other a "south" polarity and passing from one pole through the rotor to the pole of opposite polarity on the other side. Thereby the magnetic circuit is completed.

When the alternating electric current is applied, it flows in one direction for a fraction of a second beginning at zero strength, building up to its maximum and then declining to zero again, at which point the direction of flow reverses with a repeated buildup in current to maximum and then back to zero. Each cycle is completed in one-sixtieth of a second and the action is repeated continuously as long as the electric current is applied. In a two-pole motor, the rotor makes a half-turn for each reversal and a complete revolution for each cycle of the alternating current, which, for a 60-cycle current, results in a speed of 3600 R.P.M. This speed is reduced by supplying multiple poles. In the patented device there are six pairs of poles,

reducing the speed to 600 R.P.M. In motors manufactured by plaintiff eight pairs are provided, reducing the speed to 450 R. P.M.

Multiple poles are arranged in pairs, one shaded and one unshaded, spaced about the periphery of the rotor, the poles from one end of the coil alternating with those from the opposite end. In such an arrangement the magnetic flux passes from one pole radially into the flange of the rotor, thence through the metal of the flange to the nearest pole of opposite polarity, thence radially outward into such pole, and through the pole back to the coil core, completing the magnetic circuit.

Motors so operated, of the axial coil type or the offset type, had been well known in the art for many years. It was common knowledge also that multiple poles may be arranged in a single concentric circle with the flange of the rotor surrounding all of them, in which setup the magnetic flux passes outwardly from the poles into the metal of the rotor flange, thence through the rotor flange to the nearest pole of opposite polarity and thence radially inwardly and back through the pole to the coil core. The patentees recognized this arrangement as old and suggested that all the poles from one end of the coil be arranged in a cylindrical path surrounding the rotor flange and all the poles from the opposite end be placed in a second cylindrical path within the rotor flange so that the magnetic flux will pass from the outside poles into and through it to the nearest pole of opposite polarity. By this arrangement, they said, the two sets of poles are "sufficiently wide apart to eliminate substantial leakage of flux and yet sufficiently close to a rotor as to cause practically all the flux passing between the poles to go through the rotor." The idea of arranging the poles on opposite sides of the flange was disclosed in Traeger No. 2,234,420, in an offset motor, in the Pennwood axial motor and the German patent in evidence. It was not new.

In other words, the patentees, with the prior art before them, had the choice of adoption of an axial motor or an offset motor, and the option of employment of as many pairs of poles as was practical in order to reduce the high speed. They had the option of placement of the series of poles either on the outside or on the inside of the disc flange or on both sides, and the further option of various forms of, and means and methods of building, poles disclosed by prior art. The question then, is whether, by their adoption of elements disclosed by the prior art and their combination of those elements, they achieved patentable invention in their assertion of reduction of "flux leakage."

This question depends entirely upon the interpretation to be given the patents in evidence, the proceedings in the Patent Office, certain other documents and the physical exhibits, for, so far as the scientific facts are concerned, there is no crucial dispute in the testimony of the experts of the respective parties, who, after all, merely attempted to construe the documentary and physical evidence, a task eventually for this court. In other words, there is no vital dispute in the expert testimony and the ultimate question becomes one of whether this documentary and physical evidence is sufficient to sustain the finding of the District Court that patentable invention resulted.

We said, in Sales Affiliates v. National Mineral Co., 7 Cir., 172 F.2d 608, 613, "Under the federal rules we are not at liberty to review a finding of fact of the District Court unless it is 'clearly erroneous.' Here the question of whether the patents are valid or invalid depends entirely upon an analysis of prior patents and a comparison of what is taught by them and what is taught by the patentees in the two patents in suit. This is not a case where the findings of fact depend upon disputed evidence or controverted facts but is rather one where the ultimate findings depend upon whether recorded prior art is such that the patentee has achieved invention over and above the same. In such a situation, we think that the decision of the Supreme Court in Sanitary Refrigerator Co. v. Winters, 280 U.S. 30, 31, 50 S.Ct. 9, 74 L.Ed. 147, is directly in point. See also Singer Mfg. Company v. Cramer, 192 U.S. 265, 24 S. Ct. 291, 48 L.Ed. 437; Uihlein v. General

Electric Co., 8 [7] Cir., 47 F.2d 997, and Process Engineers v. Container Corp., 7 Cir., 70 F.2d 487." Here, as we said in Falkenberg v. Golding, 7 Cir., 195 F.2d 482, 486, "we eliminate any necessity of determining whether the findings of fact of the District Court, including invention, are clearly erroneous, for our conclusions are based upon the interpretation of written documents and the construction of undisputed statements of the patentee before the Patent Office, matters open to us for consideration. Charles Peckat Mfg. Co. v. Jacobs, 7 Cir., 178 F.2d 794 at page 802; Lewyt Corporation v. Health-Mor, Inc., 7 Cir., 181 F.2d 855 at page 857: Sales Affiliates, Inc. v. National Mineral Co., 7 Cir., 172 F.2d 608 at page 613."

The findings, as paraphrased by defendant in its brief, were that the claims in suit "among other things, were directed to a new combination of pole structures in an axial coil type motor, comprising axially disposed and paired outer pole pieces mounted on one end of the magnetic core, in combination with radially disposed and paired inner pole pieces mounted on the other end of the core, both sets of paired poles being arranged to provide an annular opening between them to receive the rotor band," and that this resulted in " *  * a new structural combination of old elements producing a new and beneficial result in a more facile, economical and efficient way, namely: It has less flux leakage; it is a more efficient motor; is more economical to fabricate and assemble; is in a more compact form for mounting; and greater starting and running torque is developed with less power in-put as compared with the prior art patent disclosures and motors." The court concluded, therefore, that the claims are "directed to a new structural combination patentably distinguishing from the prior art disclosures."

Thus we are confronted with the specific question of whether this combination of old elements amounts to patentable invention because of the advantages enumerated, namely, a more facile, economical and efficient operation in that it has less flux leakage and, therefore, a more efficient motor, is more economical to fabricate and assemble, is in a more compact form and, finally, has a greater starting and running torque, developed with less power in-put, as compared with the prior art disclosures. To answer this inquiry properly requires consideration of what had actually been done before and of just how much or how little the so-called new combination differs from or improves patentably upon the devices of the prior art.

In the motors of the prior art, such as the Hayden and Pennwood motors, the British patent No. 436,145; Thompson, No. 2,128,719; Traeger, No. 2,234,420, the prior Hansen No. 2,237,961 and others, optional arrangements are disclosed. In some, all of the poles are outside the flange; in others they are all inside, while in still others they are partly within and partly without. In some the pole fingers have their ends shaped to a curvature corresponding with that of the rotor flange and in others the tips are bent over to form pole facets of larger areas than the cross sectional dimensions. Some of these motors have both sets of poles divided into pairs with one pole of each pair shaded; others have only one set divided and shaded. Apparently the delvers in electric motors art knew that shading both sets results in a stronger starting torque, but has little or no effect upon the operation of the motor in clock-running operation. The claims in suit prescribe no specific form of shading and make no claim of invention in shading, but their language implies the necessity of employment of some one or more previously recognized forms of shading. In so far as shading produces a stronger starting torque, therefore, no valid claim for invention is made out.

The prior art reflects certain differences in rotor construction. The particular rotor employed in the claims in suit is the subject matter of defendant's prior patent No. 2,237,961. As we read the claims, none of them relies for patentability upon the particular rotor structure employed. Such structure, therefore, likewise is not of material importance in our determination of the issue of validity.

The prior art discloses certain variances in spacing the poles. They may be uni-

formly separated or the unshaded pole may be nearer the pole of opposite polarity than it is to the shaded pole of the same polarity. Concerning this pole spacing, the patentees said, "These positions are subject to experiment and adjustment depending on the compromise desired between the starting and operating torques and also on the use to which the motor is put." The claims contemplate outer edges of each pair of inner poles in radial alignment with the outer edges of the adjacent pairs of outer poles. An equivalent arrangement is employed in the earlier Pennwood motor, where the outer edges of each pair of inner poles are in radial alignment with the adjacent edges of the unshaded outer poles on each side. It is obvious that if Pennwood's outer poles were divided into pairs, with one pole of each pair shaded, the spacing would be the same as disclosed in the claims sued upon. Traeger, plaintiff's M-4 motor and the German patent No. 679,690 all reflect the same or equivalent ideas. The manufactured article produced under Hansen's patent employs a setup whereby the inner and outer poles partially overlap each other, but an equivalent arrangement is seen in the earlier Hansen patent and, we think, also in the German patent.

In their application, as we have observed, the patentees stressed as their inventive concept, their reduction of leakage of magnetic flux. Defendant's witness testified that, "It is well known in this art that if we provide a closed circuit, for example, a closed magnetic circuit, there will be little leakage outside of the circuit, but if we provide a definite path through which leakage may occur, then leakage will occur." With this knowledge, the patentees attempted so to construct their motor as to reduce such leakage. Inasmuch then as it is admitted that the means for reducing leakage outside the circuit was "well known in the art" and as it was recognized also that leakage will occur if a definite path is provided through which it may pass, it is apparent that the patentees, striving to apply these principles, merely followed the teachings of the art. They knew, as everyone knew, that axial motors usually had less leakage than offset motors; they knew the underlying instructive teaching of how to reduce leakage. As skilled artisans they merely applied this knowledge in their details of construction. This, to our mind, is not patentable invention.

After careful examination of all the devices, the patents, file wrappers and physical evidence, we think the allegedly new combination as defined in the findings of the trial court and as described by defendant in its brief is merely the conventional axial coil motor illustrated in the prior art, particularly in the Traeger and British patents and the patentee's earlier patent, provided with the conventional "in line" arrangement of poles of Traeger; that it is substantially the same as the Pennwood motor with the latter's outer poles paired and shaded in a conventional manner fully shown in precedent art. Stated shortly the alleged invention consists, we think, of a combination of the axial coil motor of the prior art with a Traeger pole arrangement. As a matter of fact Traeger's structure differs from the earlier art only in the arrangement of the poles in two cylindrical paths with the flange of the rotor between them.

In this connection defendant demonstrated in the trial court that it was impossible to make an axial coil motor according to Hansen's claims out of Traeger's offset coil motors. There is no question about that, but the choice between the style of motor, that is the axial type and the offset type, was one wholly within the builder's option from voluminous prior art. The patentees do not claim to have invented the axial type motor. They do claim that invention resides in their prescription of arranging the poles in two cylindrical paths with an annular gap between and disposing the rotor flange in this annular gap. But Traeger had done the same thing. In other words, Traeger's arrangement may easily be applied to the known axial coil motor by any skilled worker in the art.

As we have indicated, we might extend this discussion indefinitely, giving detailed consideration to the many similarities between the patented device and the prod-

ucts of the prior art. Such an extended exposition of the subject matter would embrace many detailed references to the various motors in evidence, either physically, or in prior art documents, in addition to what we have mentioned, and such matters as the relative placement of rotor, coil and rotor disc flange, the location of the poles on opposite sides of the flange, the practice of forming the poles of fingers projecting from the edge of the disc back around the coil and terminating in a cylindrical path adjacent the rotor flange, the varied forms of "the fingers", the effect of shading upon the starting torque, its lack of effect upon the running operation of the motor, the differences in rotor construction and pole spacing, the alignment of inner poles and outer poles, the effect of the two sets overlapping each other, and voluminous other details of construction of the prior art. So to extend this opinion would, however, we think, serve no useful purpose and be of no avail so far as our conclusions are concerned.

Defendant contends that the earlier Hansen patent is not prior art, but the documentary evidence shows conclusively that prior to filing the application of the patent in suit, the patentees had filed another application covering alleged improvements in clock motors, in which they prescribed a construction consisting of a conventional axial coil arrangement of axial outer poles, inner radial poles, with the pole faces arranged in one cylindrical path and with all the poles, both inner and outer, arranged in pairs with one pole of each pair shaded. This application shows that the patentees were then familiar with the conventional axial coil motor and with the ideas embraced in the second application. When they applied Traeger's pole arrangement to such a motor, the only change in their earlier design necessary was to shorten the inner radial poles so that their pole faces would no longer be in the same cylindrical path as the pole faces of the outer poles but were in a second cylindrical path of smaller diameter so as to leave an annular gap between the two sets of poles to receive the rim of the rotor. But this, we think, was not invention.

There is a dispute as to the success attending the Pennwood motor. Defendant insists that it was a failure. Plaintiff shows that 100,000 Pennwood clocks were made before the manufacturing company became bankrupt and insists that manufacture was discontinued in order to avoid paying royalties. Regardless of whether the Pennwood motor was a successful product, the fact remains that its nature and character were public property and that it taught certain things in the prior art which Hansen and his copatentee adopted.

It must be conceded that no one device of the prior art completely anticipates the claims in suit. They offer a combination similar to previous combinations but not entirely the same as any one of them. But we think that the question of patentable invention in this case can not be limited to an inquiry of merely whether one of the prior combinations anticipated it but rather is a question of whether a skilled workman delving in the art and with all the prior art before him, knowing the status of the art, adopting only old elements and knowing full well the use of each would have built the same device,—that is, the status of the prior art was such as to teach any skilled motor-maker how and why to make the Hansen motor.

Concerning the application of existing prior art to a new combination, the Supreme Court's language, in an early case, Brown v. Piper, 91 U.S. 37, 23 L.Ed. 200, is pertinent: " * * * this was simply the application by the patentee of an old process to a new subject, without any exercise of the inventive faculty, and without the development of any idea which can be deemed new or original in the sense of the patent law. The thing was within the circle of what was well known before, and belonged to the public. No one could lawfully appropriate it to himself, and exclude others from using it in any usual way for any purpose to which it may be desired to apply it." Later in Pennsylvania Railroad Co. v. Locomotive Engine Safety Truck Co., 110 U.S. 490, 4 S.Ct. 220, 222, 28 L.Ed. 222, the court adhered to this reasoning, saying: "It is settled * * * that the

application of an old process or machine to a similar or analogous subject, with no change in the manner of application, and no result substantially distinct in its nature, will not sustain a patent, even if the new form of result has not before been contemplated." In Cuno Engineering Corp. v. Automatic Devices Corp., 314 U. S. 84, 91, 62 S.Ct. 37, 41, 86 L.Ed. 58, the court said: "* * * We cannot conclude that his skill in making this contribution reached the level of inventive genius which the Constitution, Art. I, § 8, authorizes Congress to reward. He merely incorporated the well-known thermostat into the old 'wireless' lighter to produce a more efficient, useful and convenient article. Cf. Electric Cable Joint Co. v. Brooklyn Edison Co. [292 U.S. 69, 54 S.Ct. 586, 78 L.Ed. 1131] supra. A new application of an old device may not be patented if the 'result claimed as new is the same in character as the original result' (Blake v. San Francisco, 113 U.S. 679, 683, 5 S.Ct. 692, 694, 28 L.Ed. 1070) even though the new result had not before been contemplated. * * * Ingenuity was required to effect the adaptation, but no more than that to be expected of a mechanic skilled in the art.

"Strict application of that test is necessary lest in the constant demand for new appliances the heavy hand of tribute be laid on each slight technological advance in an art. * * *"

In Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Corp., 340 U.S. 147, 71 S.Ct. 127, 130, 95 L.Ed. 162, the court said that, "Courts should scrutinize combination patent claims with a care proportioned to the difficulty and improbability of finding invention in an assembly of old elements. * * * A patent for a combination which only unites old elements with no change in their respective functions, such as is presented here, obviously withdraws what already is known into the field of its monopoly and diminishes the resources available to skillful men. This patentee has added nothing to the total stock of knowledge, but has merely brought together segments of prior art and claims them in congregation as a monopoly." See also Office Specialty Mfg. Co.

v. Fenton Metallic Mfg. Co., 174 U.S. 492, 497–498, 19 S.Ct. 641, 43 L.Ed. 1058 and McCord Corp. v. Beacon Auto Radiator Co., Inc., 1 Cir., 193 F.2d 985, 988.

We think defendant's contribution is clearly within the category of combinations found to lack patentable invention in these cases. Every element was old. The operations of the several factors were the same as taught by the art. The patentees may have produced a more compact, more efficient motor; they may have reduced the leakage of flux; but what they did was within the knowledge of any skilled artisan in the trade. The result achieved is the same as that of the prior art, improved only by the ordinary skill of the worker in the art. Of course it is not essential to the knowledge of such workmen that each and all the devices have been in practical use. Any helpful contribution to knowledge made public, is within the domain of what the artisan is bound to know. See Tashjian v. Forderer Cornice Works, 9 Cir., 14 F.2d 414.

Inasmuch as, after careful search, we find no evidence to support the finding of patentable invention, the judgment is reversed for further action not inconsistent with the announcements herein.