KOEHRING COMPANY, Plaintiff,

v.

E. D. ETNYRE & COMPANY, Inc. and Harold Lund, Defendants.

No. 64 C 12.

United States District Court
N. D. Illinois, W. D.

March 7, 1966.

William A. Denny, Koehring Company, Milwaukee, Wis., William E. Lucas, Lucas & Coffee, Chicago, Ill., for plaintiff.

Homer J. Schneider, Wolfe, Hubbard, Voit & Osann, Chicago, Ill., for defendant.

## MEMORANDUM OPINION

WILL, District Judge,

Plaintiff, Koehring Company, brings this action seeking damages and other equitable relief because of defendant Etnyre's marketing of a self-propelled chipspreading machine in competition with a similar machine manufactured and sold by Koehring through its Flaherty Division (Flaherty). Specifically, Etnyre is charged with patent infringement, misappropriation of trade secrets or other acts of unfair competition and breach of an exclusive distributorship contract under which it was obligated both to refrain from selling competitive equipment and to use its best efforts in the promotion and sale of Koehring's Flaherty chipspreader. Defendant Lund, Chief Engineer of Flaherty prior to its acquisition by Koehring and for four and one-half months thereafter and subsequently an employee of Etnyre is charged with misappropriation of trade secrets and, additionally, with breach of certain agreements which required Lund to disclose all discoveries and inventions to Koehring while in its employ and prohibited him from engaging in any business activity in competition with Koehring prior to September 1, 1962. Koehring further alleges that the defendants' conduct was the product of a conspiracy and that, in particular, Lund's breach of the no-competition agreement was induced by Etnyre. Accordingly, it seeks judgment against both defendants jointly and severally.

The background of the instant controversy and the facts pertaining to each element of the plaintiff's complaint are presented in detail in the findings of fact and conclusions of law which accompany this memorandum and, accordingly, need not be repeated here. There are, however, several contentions raised by plaintiff at trial and subsequently upon brief which merit discussion.

As shown by the findings of fact, the court is convinced that the subject matter of United States Patent No. 3,086,684 was invented solely by defendant Harold Lund. Gene P. Flaherty, then president of Flaherty, Inc. and now employed by Koehring was neither the sole inventor, as he claimed in the patent application nor can he be classed as a joint or co-inventor with Lund. Flaherty's claim to the patent is not based on his disclosure of any scheme, suggestion or principle to Lund, but rests merely on the fact that he was the majority stockholder and chief executive officer of Flaherty prior to its acquisition by Koehring and thus was entitled to reap the benefits of his employee's labor.

Koehring relies on the fact that Lund admits that Flaherty made "some suggestions" during a meeting at which problems regarding the chipspreader gate assembly were discussed and asks the court to infer from this that Flaherty described the essentials of the radial gate assembly disclosed in the patent, leaving Lund merely to work out the details. No such inference can be drawn from the record. Significantly, Gene P. Flaherty himself admits that

Lund was entirely on his own in the development of the radial gate. Flaherty does not claim that he suggested any idea incorporated in the patented construction and points out that during this period he was away from the Flaherty plant for substantial lengths of time.

In short, Lund, while an employee of Flaherty in point of law, conducted his development activities alone. The instant case, therefore, is factually similar to Allegheny Steel and Brass Corporation v. Elting, 141 F.2d 148 (7 Cir. 1944). While plaintiff refers to Allegheny Steel to support its contention that the employer may claim inventorship where an employer-employee relationship is involved, there is no magic in the legal description of Lund's relationship to Flaherty. The question of inventorship depends on the actual conduct of the parties with respect to the development of the patent rather than on the legal relationship existing between them. In Allegheny Steel, the court found the independent contractor to be the sole inventor, rejecting his principal's claim of joint inventorship. Flaherty's suggestions to Lund were similar to the suggestions given the independent contractor in Allegheny Steel. That Flaherty was Lund's employer does not allow him to claim inventorship when the record does not support his claim and, on the contrary, shows that Lund, working "on his own", developed the construction disclosed in the patent.

The statutory requirements as to inventorship are inflexible and the severity of the remedy prescribed for a false claim of invention cannot be tempered by the court. While Flaherty did not act out of malice and the property right in the patent was assigned by him to his corporation and thence to Koehring just as Lund would have been obligated to do, the fact remains that Patent No. 3,086,684 was issued initially to one who was not the inventor and, accordingly, said patent is void.

The evidence also shows that Claims 4 and 6 of the patent in suit, allegedly infringed by Etnyre, are invalid for want of invention. When the subject matter of these claims is first compared with the prior art, the construction shown in the patent appears to be a substantial advance over prior chipspreading machines. Closer examination, however, reveals that this initial impression stems from the modernity of the exterior design as compared with the crude appearance of earlier machines and the fact that the elements of the gate control means are grouped together in a manner which suggests that the mechanism is highly complex. The rigorous standard of invention is not met by visual impressions, but rather, must be found in the actual construction employed in the device. As noted in the findings, the result described in the patent is easily achieved through application of mere mechanical skill by one familiar with the prior art.

Plaintiff emphasizes the fact that the gate construction detailed in the patent in suit was novel and unique in the self-propelled chipspreader field, however, the prior art cannot be so narrowly defined. The gate design developed by Lund and described in the patent is made obvious by the prior patents covering other types of spreaders and spreader gates. Moreover, the shiftable latch pin arrangement is derived from other devices where it is obvious and well-known and requires no special inventive skill for adaptation to a chipspreading machine. Lund, lacking formal engineering training, may not have come by his design in this fashion, however personal discovery is not the measure of patentability.

Plaintiff's claim for misappropriation of trade secrets and unfair competition rests on a series of erroneous legal premises which, when taken as a whole, result in Koehring's claiming damages for Etnyre's use of ideas which never belonged to Koehring, are not unique, and were never secret. As noted in the findings of fact, Koehring has not demonstrated the existence of any trade secrets in the chipspreader field and Etnyre has shown that no such secrets can be found.

What has been demonstrated is Harold Lund's skill in applying general knowledge in the design of chipspreading machines. Lund first exercised that skill for Pickett & Nelson Construction Company; thereafter for Flaherty and Koehring; and afterward for Etnyre. Plaintiff's position is tantamount to an assertion that Lund's skill is a trade secret which it owned and continues to own despite termination of the employment relation. Were this accurate, it would appear that Flaherty and Koehring should be similarly liable to Pickett & Nelson. Moreover, if Lund was permanently precluded from exercising his skills in the chipspreading field, Koehring had no reason to obtain Lund's promise to refrain from competition for the three years following its acquisition of Flaherty.

The "trade secrets" claimed by Koehring fall into three categories: (1) general descriptions of elements in a chipspreading machine whose construction and operation is fully visible to anyone examining the machine; (2) specific devices found in the Etnyre chipspreader which are not employed on and were never developed for the Flaherty machine; and (3) a description of a self-locking truck hitch which Lund built while employed by Flaherty and which was shown in a Flaherty advertising brochure but was thereafter discarded and never used on any machine.

Koehring acknowledges that the court must find that the alleged trade secrets involve matters which were novel and unique; that the information belonged to Koehring and was misappropriated by Lund; and that the information was in fact secret. It attempts to fulfill these burdens of proof by the following contentions. First, all of the elements of both the Koehring and Etnyre chipspreaders are novel and unique insofar as Etnyre is concerned because Etnyre could not have developed its chipspreader with the personnel it employed prior to Lund. Second, the ideas which Lund set down in rough sketches after leaving Koehring's employ must have been thought of while Lund was still employed by Koehring and should have been disclosed to Koehring, so that they belong to Koehring and Lund's failure to disclose them amounted to misappropriation. Third, even if Etnyre could have obtained the information by other means, including a simple examination of a Flaherty chipspreader, obtaining any information from Lund amounts to wrongful use of Koehring's property. Finally, all matters must necessarily be secret because no other firm before Etnyre produced self-propelled chipspreaders in competition with Koehring.

A product or process does not become "novel" because no present employee of a firm has the knowledge necessary to develop it. Similarly, a design or idea which has been made public does not become "secret" because the manufacturer then has no competitors. Both novelty and secrecy must be determined from the nature of the device or process itself. For example, the truck hitch designed by Lund may have been "novel" in the sense that it was never previously employed in a chipspreading machine. It may have been "unique" in the sense that Lund fabricated the device himself rather than purchasing it from a supplier, and, until it was shown in a photograph, it was "secret" in the sense that no one outside the Flaherty plant knew that such a device had been built. Such facts, however, do not satisfy the requirements of a trade secret. The record is clear that all the elements of the hitch in question were known and used by manufacturers of commercial hitches. Koehring emphasizes the fact that Etnyre might have learned the art of chipspreading from "reverse engineering" a Flaherty machine or by hiring someone other than Lund with attendant problems of trial-and-error and experimentation. Unquestionably, such problems were avoided or minimized by hiring Lund. That fact, however, does not mean that the information which Lund used was improperly disclosed. Plaintiff's reference to cases involving the wrongful acquisition of information

which is secret when acquired but public when subsequently used or which could be acquired by experimentation assumes the very question in issue. The use of information is not actionable because it could have been acquired by experimentation, but because, when acquired, it was secret. If it was not secret, as Lund's information was not, Etnyre was free to forego experimentation and hire Lund. The three-year covenant not to compete executed by Lund and Koehring was presumably designed with this in mind.

Lund's work in designing and building a prototype chipspreader for Etnyre, however, cannot be classified as "mere planning". In terms of the contract language, the case is identical to DeLong Corp., v. Lucas, 176 F.Supp. 104 (S.D. N.Y.1949), engineering being no less a phase of Koehring's business than manufacture and sale. Koehring, however, relies on DeLong for much more than this single principle. It attempts to apply the entire discussion of damages in that case to the facts here, without taking into account the fact that a $16,-000,000 Texas Tower contract obtained by a single bid is hardly comparable to the design of a chipspreading machine which is then manufactured and publicly sold for a period of time to various customers.

The findings herein demonstrate that plaintiff has not met its burden of proving the damages which are proximately related to the acts constituting the breach of the covenant. Moreover, there is substantial evidence to indicate that no recoverable damages resulted at all. Koehring has simply relied on the fact that beginning in 1963 it lost its monopoly in the self-propelled chipspreader field, that its sales declined somewhat, that it was forced to reduce its prices and that Etnyre sold a substantial number of machines. If it was wrong for Etnyre to enter the chipspreader business at all, such evidence might bear on the damages recoverable and the case would be somewhat comparable to DeLong. However, the unlawful conduct here involved is merely the activity of Lund for approximately three months, from May 25, 1962 until September 1, 1962 and there is no basis in the record for determining the measure of damages recoverable for the breach, apart from the measure specified by the liquidated damages clause of the contract.

The final issue raised by Koehring's complaint relates to Etnyre's alleged failings as an exclusive distributor of the Flaherty chipspreader. Here, too, plaintiff suggests that its right to relief is automatically imposed by law and does not depend on the particular facts of this case. The cases cited by plaintiff do not support such an assertion. At best, they hold that Koehring had the right to terminate the distributorship contract when it first learned of Etnyre's competitive plans and did not have to wait until Etnyre formally breached the contract by "manufacture and sale" of a competitive machine. Cowley v. Anderson, 159 F.2d 1 (10 Cir. 1947). Koehring, however, chose not to exercise its right to terminate the contract, and elected to waive its right to terminate even though it knew that Etnyre's competition was imminent. Similarly, the facts do not support Koehring's claim that Etnyre failed to use its best efforts in the sale of Flaherty chipspreaders.

In short, plaintiff has failed to prove any of the elements of its case aside from Lund's breach of the no-competition agreement. With respect to the patent, it has not rebutted defendant's preponderant evidence showing Lund to have been the sole inventor. In any event, the particular claims relied on involve no invention and are invalid. It has not shown the existence of any trade secrets nor rebutted the substantial evidence demonstrating that no such secrets were present. Its contention that Etnyre failed to use its best efforts as a Koehring distributor is negated by the facts and, to the extent that damages might be recoverable for Etnyre's breach of the distributorship contract, plaintiff has offered no evidence from which proximate damages can be measured or which

would relate to the effect of Koehring's decision to defer termination of the Etnyre distributorship until after the latter marketed its own chipspreading machine.

As set out in the findings of fact and conclusions entered herewith, Koehring is entitled to recover $2,475.00 jointly and severally from the defendants, that being the liquidated damages specified for breach of Lund's covenant not to compete. Judgment for the aforesaid sum will be entered for the plaintiff, without costs.

The Court, having examined the pleadings, having heard and considered the documentary evidence and testimony presented at trial, the oral arguments and briefs of counsel and being fully advised in the premises, files herewith its memorandum opinion and enters the following findings of fact and conclusions of law:

### FINDINGS OF FACT

#### A. DESCRIPTION OF THE PARTIES AND JURISDICTIONAL FACTS

1. Plaintiff Koehring Company (Koehring) is a Wisconsin corporation having its principal place of business in Milwaukee, Wisconsin.

2. Defendant E. D. Etnyre & Company, Inc. (Etnyre) is an Illinois corporation having its principal place of business in Oregon, Illinois within the Northern District of Illinois, Western Division.

3. Defendant Harold Lund was, at the time this suit was filed, a resident of Oregon, Illinois and is presently a resident of Rockford, Illinois, both cities being within the Northern District of Illinois, Western Division.

4. The amount in controversy as to defendant Lund, determined on the basis of the pleadings prior to commencement of trial, exceeds $10,000.00 exclusive of interests and costs.

5. The amount in controversy as to defendant Etnyre, similarly determined and notwithstanding the possibility of treating the non-patent allegations of the complaint as pendent claims, exceeds $10,000.00 exclusive of interests and costs.

6. Koehring filed this action in the Western Division of this District on March 6, 1964. Trial, and other proceedings in this cause, were had at Freeport, Illinois in the Western Division of this District and, by agreement of the parties, at Chicago, Illinois in the Eastern Division of this District.

#### B. NATURE OF THE CASE

7. Koehring is the owner, by assignment from Gene P. Flaherty, of United States Patent No. 3,086,684 relating to a Spreader Gate Assembly.

8. Koehring alleges that Etnyre infringes said patent. Subsequent to filing the instant complaint, Koehring restricted its charge to the infringement of claims 4 and 6 of said patent by certain machines manufactured by Etnyre in 1963, commonly referred to as Etnyre's 1963 Model Self-Propelled Chipspreaders.

9. Koehring further alleges that defendant Lund wrongfully appropriated certain trade secrets and other property belonging to Koehring, as described more fully later, in violation of an "Inventions and Trade Secrets Agreement" executed by Koehring and Lund, which acts it asserts are additionally actionable as acts of unfair competition. During the trial of this cause, Koehring limited its claim of misappropriated trade secrets to a certain hitch or hook and a design for a radial gate and gate operating mechanism, the characteristics of which are more fully detailed later.

10. Koehring further alleges that defendant Lund wrongfully engaged in the development of chipspreading machines manufactured by Etnyre in violation of a written agreement between Koehring and Lund prohibiting competitive activities by Lund prior to September 1, 1962, also contending that Etnyre is responsible for having induced Lund's alleged breach of this agreement.

11. Koehring further alleges that Etnyre breached certain duties owed to

Koehring as an exclusive distributor of Koehring chipspreading machines by secretly engaging in the development and promotion of its own competitive product while remaining a Koehring distributor.

12. Koehring further contends that the conduct alleged in paragraphs 8–12 above, were the product of a conspiracy between Etnyre and Lund, and accordingly seeks entry of judgment on all allegations against the defendants jointly and severally.

13. Koehring seeks the following relief: (a) an injunction prohibiting the manufacture of chipspreading machines by Etnyre and Lund for a period of four (4) years from the date of their amended complaint (viz., until January 13, 1969); (b) a perpetual injunction prohibiting defendants' use of all trade secrets and other property allegedly misappropriated by Lund; (c) an injunction prohibiting infringement of Patent No. 3,086,684; and (3) the amount of damages allegedly suffered by Koehring *plus* the amount of profits realized by Etnyre and Lund to date in the manufacture of chipspreading machines, together with $25,000 exemplary damages, or a total of $413,183.00 as calculated by Koehring. Koehring's prayer for treble damages and attorneys' fees contained in its complaint have been abandoned by counsel on brief.

14. Prior to the trial of this cause Etnyre filed a counterclaim alleging that Koehring's maintenance of this action and other conduct with respect to the matters in suit constituted an attempt to monopolize in violation of § 2 of the Sherman Act, 15 U.S.C. § 2. During the trial of this cause, the aforesaid counterclaim was dismissed by agreement of the parties.

## C. GENERAL BACKGROUND FACTS

15. Self-propelled chipspreading machines were initially manufactured on a commercial basis principally by Flaherty Mfg. Inc. (Flaherty, Inc.) of Pocatello, Idaho.

16. Koehring acquired all of the stock of Flaherty, Inc. on September 1, 1959, thereafter operating the company as a subsidiary. On July 23, 1962, Flaherty, Inc. was dissolved, its assets and liabilities assumed by Koehring and its business thereafter operated as the Flaherty Manufacturing Branch of Buffalo-Springfield Company, a division of Koehring.

17. Flaherty, Inc. was incorporated in September, 1953. Its president and majority stockholder was Gene P. Flaherty. Prior to September, 1953, Gene P. Flaherty engaged in the business of selling construction machinery and supplies under the name Flaherty Equipment Company.

18. In the course of operating his business, Gene P. Flaherty learned of certain owner-built chipspreading machines and, in 1952, in the course of constructing a portable rock-crushing plant at the premises of the Western Construction Company, Flaherty and his employees observed a self-propelled chipspreading machine which had been constructed by one Knippel.

19. Subsequently, Gene P. Flaherty, with the assistance of others, attempted the construction of a self-propelled chipspreader which machine proved unsatisfactory. He then made arrangements with others to develop a different design of chipspreader, resulting in the construction of six chipspreaders for Flaherty by the Bellville Mfg. Company. Thereafter, manufacture of chipspreaders was continued by Flaherty, Inc.

20. In 1952, while constructing the portable rock-crushing plant at the Western Construction Company, Flaherty Equipment Company employed Harold Lund as a welder. Following completion of work on the rock-crushing plant, Lund was employed by the Pickett & Nelson Construction Company in Idaho Falls, Idaho and during that employment, built a self-propelled chipspreader, using some parts from the abandoned machine which Flaherty had attempted to construct.

21. In general, a self-propelled chipspreading machine (or chipspreader) is a vehicular machine with a power plant driving the vehicle and operating certain

mechanical devices on the unit. It is employed in a road construction method known as "seal coating" in which a layer of rock chips is spread on a road surface which has just been sprayed with liquid bitumen or asphalt, the surface then being compacted to create a durable wearing surface.

22. Certain elements are common to all such chipspreading units. On the rear of the vehicle is a hopper for receiving aggregate chips or gravel. The chips or gravel are carried from this hopper by means of a conveyor belt or belts to a spread hopper on the front of the vehicle. From this spread hopper the chips are spread over the road surface in swathes of varying widths depending on the job requirements. The width of the swath may be varied, a result generally achieved by providing means for selectively opening and/or closing some or all of a series of gates which control the discharge opening of the spread hopper. The rear receiving hopper is filled from a dump truck connected at its rear end to the rear end of the chipspreader by means of a truck hitch. The truck is pulled backwards by the chipspreader, so that gravel chips may continue to be spread from the front end of the chipspreader while a new supply of chips is being dumped into the rear hopper, thus permitting a continuous spreading operation.

23. In 1955, Lund was hired by Flaherty Inc. as a permanent employee and began working on Flaherty chipspreaders in approximately June of that year. Lund was given responsibility for design, troubleshooting and experimentation. When problems arose or improvements were needed, the information was given to Lund for the development and design of the necessary modifications.

24. Shortly after joining Flaherty, Inc., Lund was given the title of Shop Superintendent and purchased 11 shares of Flaherty, Inc. stock at the then par value of $100 per share. The controlling interest in Flaherty, Inc. was at all times owned by Gene P. Flaherty, Lund's 11 shares, at the time of Koehring's acquisition, being but 2% of the 522 shares then

outstanding. In January, 1958 Lund was given the title of Chief Engineer of Flaherty, Inc. and in January, 1959 was elected as a director of Flaherty, Inc.

25. While Gene P. Flaherty, as President of Flaherty, Inc., was nominally in charge of the entire operations of the company, the major part of his business activity concerned sales and other work in the consumer field. The office work in Pocatello was managed by Joe Aspitarte. Willard Horner was in charge of the actual production and manufacturing operations while, as noted above, Lund was responsible for design and engineering.

26. During 1955 or early 1956 Lund constructed a hitch for the Flaherty chipspreader employing a design different from that then used by Flaherty, Inc. Said hitch had a generally V-shaped jaw opening and a self-locking latch mechanism using a dog and a cam for automatically locking a latch member when moved about its pivot by the force of a towing member on a dump truck. The hitch also had remotely controllable means for disengaging the dog thereby permitting the towed vehicle to release itself. In the sense that such a construction had never been employed previously by Flaherty, Inc., it was referred to as the "experimental hitch".

27. The "experimental hitch" was mounted on one chipspreading machine. A picture of that machine, revealing said hitch, was published in a sales brochure by Flaherty, Inc., however the hitch was never used on any chipspreading machine offered for sale. The hitch was removed from the machine and stored in Flaherty's shop.

28. The "experimental hitch" was not employed by Flaherty, Inc. due to the fact that at that time Flaherty lacked the necessary means for in-plant construction of the hitch and found it more expensive to build than the hitch then in production or other hitch designs which had many of the same features but employed different principles of construction.

29. At this time the spread hopper gate used in construction of the Flaherty

chipspreader consisted of multiple flat sliding gates. Some time prior to January, 1958, a meeting was held between Gene P. Flaherty, Lund, Aspitarte and others, at which meeting Flaherty reported difficulties which had been arising in the field with respect to the sliding gates and customer criticism directed at the difficulty of opening the gates when rock chips became forced into spaces between them. As an outcome of this discussion, Lund said he thought he could develop a new type of gate design that would do a better job. The details of this discussion and of the development of a gate assembly employing segmented radial gates and other mechanisms are set forth more fully below.

30. The gate assembly thus developed became the subject matter of a patent application filed by Gene P. Flaherty, as inventor, on November 21, 1958 (Serial No. 775,488), eventually resulting in the issuance, on April 23, 1963, of Patent No. 3,086,684, the patent in suit.

31. In the spring of 1957, having received inquiries from its contractor customers regarding the Flaherty chipspreader, contacted Flaherty, Inc. and sought exclusive distributorship contracts for certain territories.

32. Prior to this time Etnyre had been engaged in the business of manufacturing and selling equipment for blacktop roads for several decades, including, in particular, transports and distributors which carry liquid bitumen or asphalt to the road site and spray it on the prepared road surface prior to the application of gravel chips. Etnyre had also manufactured an unpowered base rock spreader for another concern and unpowered chipspreaders for the U. S. Army, however, it had not manufactured or designed a self-propelled chipspreader.

33. As a result of Etnyre's request for a distributorship, Flaherty, Inc. directed its attorney to prepare two exclusive distributorship agreements, one covering the northern portion of Illinois and the entire State of Wisconsin and the second covering certain states and areas in the eastern one-third of the United States.

34. The aforementioned agreements were executed on behalf of Flaherty, Inc. by Gene P. Flaherty and an original and two copies were forwarded to Etnyre on May 22 and June 17, 1957, respectively. The agreements were retained by Etnyre in its files and were never executed by Etnyre. Subsequently, in a conversation between Joe McCoy, Vice President and Chief Executive Officer of Etnyre, and Gene P. Flaherty, McCoy stated that a contract was no better than the paper it was written on and that his word and handshake was as good as his bond.

35. Thereafter, Etnyre proceeded to operate under the provisions of the contracts, accepting the benefits thereunder and conducting itself as the exclusive Flaherty distributor as provided in the contracts. The conduct of Etnyre during this period indicates their uneqivocal acceptance of all of the contract terms with the exception of that portion of the contracts providing for a five-year no-competition agreement in the event the contract was terminated. Koehring, as successor to Flaherty, Inc.'s interest in the contract does not rely on this latter provision.

36. The aforesaid contracts provided, inter alia, that Etnyre use its best endeavors to sell Flaherty equipment in the specified territory; that Etnyre refrain from manufacture or sale of competitive products; that in the event either party breached their respective promises, the other party might, at its option, terminate the relationship at once; and that in all other instances, the agreement might be terminated by either party by 30 days written notice.

37. In June, 1961, a misunderstanding arose as to the exact boundaries of Etnyre's "Eastern Territory" and in July, 1961, at Etnyre's request, a new distributorship agreement covering the "Eastern Territory" was executed by Gene P. Flaherty on behalf of Flaherty, Inc. (then a subsidiary of Koehring) and by Marshall L. Taylor, Eastern Sales Manager for Etnyre. The provisions of this executed contract were not materially dif-

ferent from those of the earlier agreements.

38. In September, 1959, Koehring entered into an agreement with the stockholders of Flaherty, Inc. providing for the purchase of Flaherty, Inc.'s capital stock. Negotiations for this agreement were carried on between Raymond Burton, an officer of Koehring and Gene P. Flaherty. Lund was informed of the decision by Flaherty and advised that his signature was required on the stock transfer agreement. There is no suggestion that the directors or shareholders of Flaherty, Inc. engaged in any discussion or formal vote regarding the transaction, either among themselves or with Koehring.

39. The Stock Exchange Agreement, dated September 1, 1959, included, inter alia, the following provisions:

3. *REPRESENTATIONS AND WARRANTIES OF STOCK-HOLDERS*

The Stockholders make the following representations and warranties * * "

(i) *Patents.* The Company owns the following U.S. patent applications registered in the name of Gene P. Flaherty:

*   *   *   *   *   *

(ii) application filed November 21, 1958, Serial No. 775,488 covering a Spreader Gate Assembly.

7. *MISCELLANEOUS*

(f) *Covenant Not to Compete.* Gene Flaherty, Joseph Aspitarte and Harold Lund severally covenant and warrant that during the term of three years beginning with the date hereof they will not, without the written consent of Koehring, directly or indirectly, as an employee, owner, partner, agent or otherwise, participate in any manner or assist any person, firm or corporation (except Koehring) in a business or venture competitive with the business of the Company as the same is now constituted, including any phase in the process of development. Said individuals acknowledge that the remedy at law for a breach of the foregoing will be inadequate and that Koehring shall be entitled to injunctive relief plus liquidated damages for breach of this covenant which shall not be less than the benefit and/or profit received for acts constituting a violation of this covenant.

40. At about the time of this agreement, Lund was advised that Koehring then planned to continue the Flaherty manufacturing operation in Pocatello for only one year and to transfer it to Springfield, Ohio at that time. He was further advised that upon transfer to Ohio his $15,000 salary would be reduced to $10–12,000 so as to be in line with those of other Koehring employees. Flaherty and Aspitarte were re-elected as directors of Flaherty, Inc. Lund, however, was not.

41. Approximately two weeks after the Stock Exchange Agreement was executed, Lund traveled to the Etnyre offices at Oregon, Illinois to make a service call for Flaherty, Inc. While there he discussed the possibility of manufacturing self-propelled chipspreaders in Canada with Etnyre's Chief Executive Officer, McCoy.

42. After leaving Oregon, Illinois, Lund traveled to Toronto, Ontario, Canada and there conferred with Richard Rohmer, an attorney, as to the patent situation on self-propelled chipspreaders in Canada. He also conferred with William A. Ryder, a Flaherty, Inc. dealer in Toronto, regarding the idea of manufacturing chipspreaders in Canada. Returning from Toronto to Pocatello, Lund again stopped in Oregon and spoke to McCoy.

43. At this time it was Lund's general intention to leave the employment of Flaherty, Inc. and to manufacture a self-propelled chipspreader in Canada, if he could be assured that such a venture would not be prohibited by the patent situation in Canada and the no-competition agreement which he had signed could not be enforced in a Canadian court.

44. Lund's plans for the design of a competitive chipspreader were vague at this time and were not reduced to even the simplest schematic drawings. He

simply was confident that, using his general knowledge, he would be able to develop designs which were different from those then in use by Flaherty, Inc. and would be sufficiently modified to avoid the possibility of infringing any design revealed in the then-pending patent applications.

45. On or about September 24, 1959, upon Lund's return from Toronto and Oregon, Lund executed an agreement with Koehring entitled "KOEHRING COMPANY INVENTIONS AND TRADE SECRETS AGREEMENT" which contains, in relevant part, the following obligations:

1) To promptly disclose to my supervisor in the Company all improvements, discoveries or inventions conceived, developed, or acquired by me while in service of Company and which relate to the business carried on or contemplated by company * * *;

2) * * * to treat as confidential, trade secrets of Company known to or acquired by me during my employment, and I will not, while in employ of Company or at any time thereafter, disclose to anyone, directly or indirectly, any such trade secrets, (In general a trade secret is any unpublished formula, pattern, device or compilation of information used in a company's business which gives it an advantage over competitors); and * * *

4) Any and all improvements and/or inventions made or acquired prior to employment by Flaherty Mfg., Inc. to be excluded except complete developments on the Flaherty Spread-Master, Flaherty Broom-Master and the Flaherty Roll Master.

46. During October, November and December, 1959, Lund's plans to leave the employ of Flaherty, Inc. crystallized and he was in contact with Rohmer, Ryder and McCoy. He indicated to McCoy that he would also like to obtain an opinion from an attorney in the United States with respect to the legality of the proposed Canadian manufacturing operation.

47. The correspondence relating to the proposed Canadian venture during this period does not relate to the design, construction or other details of a chipspreader, with the exception of one letter from Lund to McCoy suggesting that Etnyre contact the J. I. Case Co., Racine, Wisconsin, for a quotation on a power unit for the machine and setting forth certain specifications for such a unit.

48. During at least the last six weeks of his employment with Flaherty, Inc., Lund's activities were related to the Flaherty Broom-Master. He was not actively engaged in any work relating to Flaherty's chipspreading machines.

49. On January 15, 1960, Lund resigned as Chief Engineer of Flaherty, Inc.

50. On January 16, 1960, Lund began to travel to Toronto, stopping again en route at the Etnyre offices in Oregon, Illinois and discussing a tentative agreement with regard to the Canadian venture.

51. Lund then proceeded to Toronto and, while in Toronto, prepared some 20–25 simple, hand-drawn, not-to-scale sketches of various parts of a chipspreader, including, in particular, a sketch of a truck hitch similar in principle to the one constructed for Flaherty in 1955–56 and abandoned by Flaherty and a sketch of a gate design for a spread hopper the gate construction and operation of which differed from that employed by Flaherty, Inc. Lund consulted with Canadian counsel as to the possibility of obtaining a Canadian patent on this gate design.

52. During this same time Lund was contacting various potential suppliers and obtaining price quotations for chipspreader component parts.

53. The Lund-Etnyre-Ryder Canadian chipspreader venture was abandoned on or about February 16, 1960 upon receipt of a legal opinion that pursuit of this venture in Canada could be viewed as a violation of the Covenant Not To Compete executed by Lund. Etnyre determined at this time to defer consideration of entering the chipspreader market until some

later date, "possibly in a year or so", and offered Lund a job involving other phases of their business. Lund returned to his home in Idaho.

54. On April 17, 1960, Lund wrote to McCoy inquiring as to the state of Etnyre's interest in the manufacture of a chipspreader. The letter indicates that while Lund had been making some detailed sketches for a proposed chipspreader, he planned to abide by the terms of his agreement with Koehring and refrain from any commercial competitive enterprise until the no-competition period had expired.

55. On June 20, 1960, Lund was hired by Etnyre, allegedly subject to an agreement that when Etnyre commenced manufacture of self-propelled chipspreaders, Lund would receive a bonus of $200.00 per machine sold "once the machine was on the market and going good", in addition to his regular salary. The bonus agreement is the subject of dispute between Etnyre and Lund, however, said dispute is irrelevant to this case.

56. Between June 20, 1960 and May 23, 1962, Lund performed various services for Etnyre, none of which involved self-propelled chipspreaders or any other activity prohibited by the covenant in the Stock Exchange Agreement with Koehring.

57. During this same period, Etnyre continued to act as Flaherty's exclusive distributor in the territories assigned to it.

58. On May 23, 1962, Etnyre decided to begin plans for a competitive chipspreader for the 1963 selling season. On the understanding that planning for competition was permissible under the Lund-Koehring agreement, Lund commenced, on May 25, 1962, initial planning for the Etnyre chipspreader.

59. On May 25, 1962, Etnyre also placed an order for three additional Flaherty chipspreaders which were sold in the usual course of business as hereinafter more fully detailed.

60. In building the prototype for the Etnyre chipspreader, Lund prepared inked scale drawings. Parts were fabricated from these drawings and modified as needed for inclusion in the prototype. As various parts were finalized, draftsmen working under Lund's supervision prepared standard drawings. Some of the inked drawings prepared by Lund were drawn upon reference to the sketches which Lund had made in Toronto and at his home in Idaho after terminating his employment with Flaherty, Inc.

61. Unlike the majority of parts for the prototype, the hitch for the prototype was made without an inked scale drawing, a person or persons other than Lund fabricating the hitch by referring directly to the crude sketch which Lund had drawn while in Toronto.

62. A majority of the drawings for the prototype were completed prior to September 1, 1962, however some were not completed until after that date.

63. By August 1, 1962, the development process had proceeded to the point where standard production drawings of certain parts were prepared, at least 19 being drawn in that month.

64. The Etnyre prototype chipspreader was basically completed by the end of October, 1962. While a formal final decision to begin production was not made until about this time, the commercial feasibility of the prototype was generally assumed as evidenced by the ordering of quantity parts as early as October 1, 1962.

65. The prototype was tested in the Etnyre factory on November 14, 1962, without laying gravel chips. On November 26, 1962 the Etnyre machine was displayed to Etnyre sales personnel and the salesmen advised that Etnyre would enter competition with Flaherty. This was the first announcement of Etnyre's competitive intentions.

66. On or about October 22, 1962, Flaherty learned that Etnyre was building a chipspreader. Aspitarte of Flaherty called McCoy at Etnyre to confirm the report and was told that in fact Etnyre was planning to enter into competition with the Flaherty chipspreader.

This fact was reported to Gene P. Flaherty.

67. Etnyre did not write Koehring-Flaherty giving formal notice of its plans or formally indicate its intent to terminate its distributorship relationship, nor did Koehring-Flaherty notify Etnyre that it viewed Etnyre's conduct as a breach of the distributorship agreement, permitting it to terminate the relationship without notice. Gene P. Flaherty decided to visit Etnyre at the first possible opportunity.

68. On December 4, 1962, Flaherty visited Etnyre and spoke to McCoy, again confirming the fact that Etnyre planned to introduce its own chipspreader in the coming year. At that time Flaherty decided not to exercise the option to terminate the distributorship agreement and elected instead to await the commercial reception of the Etnyre machine in the hopes that he would not lose Etnyre as a distributor and that Etnyre would continue to purchase Flaherty machines.

69. On December 17, 1962, Etnyre accepted its first order for an Etnyre chipspreader, delivery to be made in May, 1963. Said order came as the result of an isolated instance of solicitation by Etnyre's Eastern Sales Manager in a letter dated November 30, 1962, four days following the sales meeting at which the Etnyre machine was displayed. The order for the Etnyre chipspreader was placed by the customer without having seen the machine.

70. On January 15, 1963, Etnyre made its first announcement of the Etnyre chipspreader to the general public.

71. On February 13, 1963, Etnyre received written notice that its distributorship agreement with Flaherty was considered cancelled, effective January 15, 1963.

72. The Etnyre chipspreader was first displayed to the industry at a trade show held on or about February 23, 1963.

73. On April 23, 1963, Patent No. 3,086,684, the patent in suit was issued to Koehring as assignee of Gene P. Flaherty. Flaherty machines incorporating the patented spreader gate assembly did not bear the patent number as required by statute during the time immediately following the issuance of the patent.

74. Etnyre was charged with infringement of the patent in suit in a letter dated July 12, 1963 and received by Etnyre on July 13, 1963. Etnyre acknowledged the notice of infringement on July 15, 1963. Following receipt of notice of infringement, 13 Model 1963 Etnyre chipspreaders were shipped to customers. Etnyre's claim of infringement is restricted to the 1963 Model Etnyre chipspreader.

75. Only a part of the territories formerly assigned to Etnyre under its Flaherty distributorship agreement are now assigned to exclusive distributors. Notwithstanding Gene P. Flaherty's decision to await the commercial reception of the Etnyre chipspreader, Flaherty-Koehring entered into an exclusive distributorship agreement to replace Etnyre as early as January 2, 1963, some two weeks before Etnyre's formal announcement of a competitive machine and six weeks prior to the cancellation of the distributorship agreement with Etnyre.

D. ALLEGED PATENT INFRINGEMENT

76. As noted above, Koehring's allegation of patent infringement is based on Claims 4 and 6 of the patent in suit and is restricted to the 1963 Model Etnyre chipspreader.

77. Claim 4 of the patent in suit describes a combination of elements in a chipspreading machine, specifically:

(a) a chipspreading hopper assembly comprising a hopper having a pair of transversely extending walls and a pair of end walls interconnecting said transverse walls;

(b) a downwardly sloping bottom wall extending from one of said transverse walls and cooperating with the other of said transverse walls to define a bottom discharge opening extending generally between said end walls;

(c) a mounting bracket on the lower portion of said other transverse wall;

(d) a plurality of segmental gates disposed in edge abutting relation and extending generally between said end walls;

(e) pivot means carried by said mounting bracket supporting said segmental gates for swinging movement between open and closed positions relative to said discharge opening; and

(f) control means carried by said other transverse wall and connected to said segmental gates, said control means including

(1) a transversely extending main control shaft,

(2) a lever for each of said segmental gates pivotally mounted on said main control shaft,

(3) a link connecting each of said levers to its respective segmental gate, and

(4) latch means releasably connecting each of said levers to said main control shaft for rotation therewith, said latch means including (a) a keeper secured to said main control shift and (b) a shiftable latch pin carried by said lever.

78. Claim 6 of the patent in suit describes a generally similar structure, being distinguished from Claim 4 as follows:

(a) the words "a hopper assembly including a hopper having an elongated discharge opening formed in the bottom thereof" replace the detailed description set out in sub-paragraphs (a), (b) and (c) in the finding above;

(b) the location of the control means with respect to the hopper is not specified; and

(c) the words "lock means for selectivity locking" is substituted for the words "latch means releasably connecting" and the description of said latch means set out in sub-paragraph (f) (4) in the finding above.

79. The other claims of the patent in suit (Claims 1–3, 5 and 7–9) are generally similar, the only additional structures therein described being a distrib-

uting roller (or spread roll), a design for a segmented gate having an outwardly projecting edge flange along one edge thereof to form a seal with an adjacent edge of an adjacent segmental gate and a gate design in which the lower part of the gate has an inwardly curved lower edge engaging the distributing roller in an overlying tangential relation when the gates are in a closed position.

80. The alleged invention described in the patent in suit was conceived and reduced to practice by Harold Lund.

81. Gene P. Flaherty did not conceive of any of the subject matter disclosed and claimed in the patent application. He merely presented the problem in a meeting with Lund and others and discussed some of the prior gates that had been used in a chipspreading machine. Flaherty did not suggest any desired result in the sense of describing a principle of construction or the means which might be used to adapt this principle to a chipspreader.

82. Gene P. Flaherty did not assist or act jointly in any manner with Harold Lund in the conception or reduction to practice of the subject matter disclosed and claimed in·the patent application. Flaherty did not contribute or suggest a single idea or element contained in the patent in suit, but merely discussed Lund's progress with him from time to time.

83. During the time Lund was working on the new gate design, Gene P. Flaherty was away from the Flaherty, Inc. plant for three and one-half to four months at a time and generally spent more than half of the total time on the road. By Flaherty's own admission, the original meeting to discuss the gate problem ended with Lund saying "let's see what I can come up with" and Lund took care of all details, worked up all the arrangements and took care of all of that phase of developing the gate. These facts are further confirmed by the testimony of Willard W. Horner.

84. Gene P. Flaherty informed his attorneys that he was the inventor of the patent in suit. He contacted the patent

attorneys, disclosed to them the subject matter and conferred with them during the preparation and prosecution of the patent application. Papers submitted by Flaherty, Inc. to the attorneys for use in preparing the application were prepared by Harold Lund.

85. Flaherty inquired as to the possibility of showing Harold Lund as "designer" on the patent application. Counsel advised Flaherty that only the name of the inventor could be shown and that "inasmuch as it appears that you alone are the inventor, it would not be possible to join Mr. Lund as a coinventor".

86. When the patent application was returned for final signature, Lund questioned the accuracy of the name on the application, indicating that he believed his name should be on the patent, not only because it was his idea, but because he understood that the patent would be invalid if it was not in the name of the actual inventor. Flaherty rejected this contention, stating that he had taken the matter up with counsel.

87. In applying for the patent in suit, Gene P. Flaherty stated that he was the sole and original inventor of the matters disclosed therein. This statement was untrue.

88. In executing the Flaherty-Koehring Stock Exchange Agreement, Harold Lund merely warranted that the application for the patent in suit was owned by Flaherty, Inc. He did not warrant its validity or indicate that Gene P. Flaherty was the inventor of the subject matter of the application.

89. Under the circumstances surrounding the negotiation of the Flaherty-Koehring exchange and the execution of the agreement, already described above, there was neither any occasion nor any reason for Lund to assert his inventorship to Koehring or representatives of Koehring.

90. Etnyre also contends that Claims 4 and 6 of the patent in suit are invalid for want of invention, each and every structural element being disclosed in the prior art and the combinations employed, to the extent not disclosed in the prior art, being obvious to skilled persons aware of the prior art and requiring only an exercise of mechanical skill. In support of its contention, Etnyre relies on several earlier patents, in particular, Trampler Patent No. 2,586,396, Davis Patent No. 2,641,477, Valantin Patent No. 2,777,700 and Webster Patent No. 2,850,216.

91. The file wrapper of the patent in suit indicates that Trampler and Davis were not considered by the Patent Office. The consideration given to Valantin and Webster. is detailed below.

92. The original application for the patent in suit was filed on November 21, 1958 and asserted 10 claims, including Claim 4 of the patent as issued (at that time Claim 8). On April 27, 1958 four of the original claims were rejected as being directly readable on either Bougmill Patent No. 2,178,320 or Edwards Patent No. 2,704,173. The balance of the claims were allowed as of that date, including what is now Claim 4.

93. The patent examiner's references to Bougmill and Edwards relate to a hopper assembly distributing roller and segmental gates, elements which, individually and in combination, are fully disclosed in the prior art. The claims then allowed all have the additional feature of describing a particular design for a segmented gate and/or a detail of the means for controlling the segmented gate.

94. Of the claims rejected, one was cancelled, two were amended to modify the description of the distributing roller and one was amended to include a description of a particular design for a segmented gate and a detailed description of means for its control. Six additional claims were added.

95. All of the claims added include references to a particular gate design feature (the flanged end and/or the curved edge overlying the distributor roll) and either refer to "latch means" generally or describe a specific latch structure.

96. On April 25, 1960, all amended and added claims were rejected, the ex-

aminer referring to Webster Patent No. 2,850,216, and pointing out that Webster teaches a plurality of segmented gate sections, equivalent flanges and latch means for the gate sections.

97. In response, patent counsel directed his remarks solely to the contention that the equivalent flanges were a patentable invention. The examiner, on March 15, 1961, rejected this contention, however he allowed two of the previously rejected claims which described the specific latch structure in the allowed claims in addition to describing the flanged ends.

98. Inasmuch as present Claim 4 of the patent in suit does not deal with the curved gate edge overlying the distributor roll, it is clear that the examiner viewed their patentability over Webster to result from the description of the specific latch structure as opposed to the general provision "latch means". Claim 6, subsequently added to the application, also does not disclose this gate design.

99. Webster's latch structure discloses a shiftable latch pin and a keeper, however it differs from the latch structure described in Claims 4 and 6 of the patent in suit in that it is not connected to the main control shaft for rotation therewith and, because of its design, has a limited number of positive control settings.

100. On March 6, 1962 a new application for the patent in suit was executed by Gene P. Flaherty, as inventor, as a continuation of the application filed November 21, 1958, certain additional claims being added, including that which now appears as Claim 6 of the patent in suit, which described the connection to the main control shaft for rotation, but did not otherwise detail the latch means. Only one added claim described latch means in detail, the description being identical to that one described earlier, but adding a fixed keeper carried by the hopper and engagable by the shiftable latch pin to lock the segmental gate in a close position.

101. The new claims were rejected by the examiner as lacking invention over Valantin, the examiner pointing out that Valantin disclosed latch means connecting levers with a main control shaft for rotation therewith and subsequently noting that the fixed keeper was disclosed in George Patent No. 2,159,554.

102. Responding to the examiner, patent counsel noted that the pending application differed from Valantin in at least two respects, first, that Valantin does not use the same mechanical principle to close the gates as it does to open them (closure being effected by a spring rather than by rotation of the main control shaft) and second, that the absence of a keeper in the Valantin closure action made "positive locking" as shown in the application impossible. To emphasize the "positive locking" feature, the term "lock means" was substituted for "latch means" in what is now Claim 6 of the patent in suit and in present Claim 7 (relating to the description of lock means in a fixed keeper). The term "latch means" was not altered in those claims which had been allowed previously, i. e., those claims which described a keeper secured to the main control shaft.

103. The distinction relied upon by patent counsel involving the ability to open and close gates by the same mechanical principle, i. e., rotation of the main control shaft, and thought to be evidenced by the substitution of "lock" for "latch" in Claim 6 (as opposed to Claim 7 which discloses a fixed keeper) is in fact no more than a statement of the result obtained by using the latch means construction detailed in the other claims. The feature which makes the result possible is the connection of the latch means to the main control shaft by means of a keeper secured to said shaft. This conclusion is further evidenced by the fact that it was unnecessary to amend the claims detailing the latch means construction by substituting the word "lock". It is thus clear that the result achieved by the aforesaid combination of lever, latch pin, keeper and main control shaft was treated as the novel feature in an otherwise well-known combination of elements with respect to those claims not also disclosing the gate design, which, as noted in finding No. 98, describe the claims allegedly infringed in Etnyre.

104. This precise feature is, however, disclosed in Trampler and also in Davis (neither of which were considered by the Patent Office) to the extent that a person exercising ordinary mechanical skill could design the construction shown in the patent in suit in view of the balance of the prior art.

105. Trampler discloses latch means consisting of a fixed (as opposed to a shiftable) pin and a keeper connected to the main control shaft for rotation therewith. While the connection consists of a curved bar secured to the main control shaft and extending outwardly to a point in the path of the pin, the principle of a direct connection between the pin and the main control shaft is fully obvious in view of Davis, and achieving this result without use of a curved bar requires no new invention. The Trampler machine achieves the same range of control settings as the patent in suit.

106. The patent in suit reveals a more complex construction, but uses well-known elements to achieve a result identical to that achieved by Trampler, with the exception of the use of the keeper for positive locking which, as noted by the Patent Examiner, is disclosed in George. The use of the keeper secured to the hopper frame is also obvious from Davis, although not specifically disclosed there because the Davis gates, being hinged inward to fall of their own weight, do not require additional lock means.

107. While the patent in suit is so designed as to employ the same lever for both adjustability of the gate opening by rotation with the main control shaft and locking of the gate opening by disengagement from the main control shaft and engagement with the hopper frame, the design of such a mechanism, while possibly new in the chipspreading art, is not novel in the general art of control means and its application to a chipspreader does not require the exercise of inventive skill.

108. The subject matter of Claims 4 and 6 of the patent in suit reveal no patentable invention over the prior art.

E. ALLEGED MISAPPROPRIATION OF TRADE SECRETS AND OTHER PROPERTY BELONGING TO KOEHRING

109. As noted above, Koehring, during the trial of this cause, stipulated that its allegation of misappropriation of trade secrets was limited to two specific items, a self-locking truck hitch and a radial gate assembly design. The descriptions of these secrets it has tendered, and which are set out below, are drawn to describe the constructions which Koehring contends Etnyre presently employs, although it is also contended that some of the elements in these constructions were in Flaherty-Koehring's possession.

110. To the extent that elements alleged as trade secrets were not in Flaherty, Inc.'s possession, Koehring contends that they were in Lund's mind and that Lund, under the KOEHRING COMPANY INVENTIONS AND TRADE SECRETS AGREEMENT (Finding 45), was obligated to disclose all such thoughts to Flaherty, Inc. before leaving their employment.

111. In the same sense, Koehring contends that Lund was obligated to disclose various other ideas, generally those depicted in the 20–25 hand drawn sketches made by Lund in Toronto (Finding 51), before leaving Flaherty, Inc.'s employ, notwithstanding the fact that the information disclosed by these sketches is in no sense the subject matter of a trade secret, but merely represent Lund's thoughts for designs different than those used by Flaherty, Inc. Koehring contends that the use of these sketches by Lund and/or Etnyre constitute acts of unfair competition in that they would have become the property of Flaherty, Inc. had they been disclosed to Flaherty, Inc. pursuant to the INVENTIONS AND TRADE SECRETS AGREEMENT.

112. The allegedly misappropriated hitch is described as a self-locking truck hitch mounted on a chipspreader and having any one of the following features:

(a) A locking cam having a truck drawbar guiding surface which forms

the upper surface of a generally V-shaped jaw opening.

(b) A remotely releasable cam pivoted rearwardly of the cam locking surface.

(c) Means for adjustably presetting the height of the hitch.

(d) Mounting means permitting vertical movement of the hitch about a horizontal pivot.

(e) Linkage connecting the hitch to a remotely located control handle for selectively moving the hitch vertically about its pivot to adjust its height.

(f) A spring for supporting the hitch in one position and a lever for moving the hitch to other vertical positions.

(g) A latch control handle at the chipspreader operator's station and linkage connecting the latch control handle to the latch dog for effecting remote control of the latch.

(h) A locking cam pivoted in the upper half of the hitch jaw.

113. The allegedly misappropriated radial gate assembly is described as a radial gate assembly in which the radial gates cooperate with a spread roll of a self-propelled chipspreader to control both the width of the swath and the flow of chip material and the radial gates have any one of the following features:

(a) A renewable wearing edge.

(b) A reversible wearing edge.

(c) Gate ends which are relatively thick with respect to the gate width.

(d) Gates which are relatively thick and/or hollow.

(e) Gates which move outwardly from a closed position through an arc perpendicular to the spread roll.

(f) A top plate on the gate and a lifting eye on the top plate which connects to a link for control purposes.

(g) Gates which are so mounted with respect to the hopper and spread roll that they do not displace material when open or closed.

(h) Gates which are so mounted with respect to the hopper and spread roll that pressure of material in the hopper assures positive shutoff when the gates are closed.

(i) A gate having a top plate, a bottom plate, side plates, a front plate and means for mounting a removable wear plate.

While Koehring contends that this describes the Etnyre gate, some of the features, particularly (e) and (g) above, are not found in the Etnyre construction. In addition, the combination of features (e) and (h) is shown by the evidence in this record to be mechanically impossible, since positive shutoff by the pressure of the material in the hopper could only occur if the gates were hinged inward.

114. The self-locking truck hitch described in Finding 112, is generally the same as the "experimental" hitch manufactured by Lund, from his general knowledge, for Flaherty, Inc. and subsequently discarded by Flaherty, Inc.

115. The self-locking truch hitch is also similar to one manufactured by Etnyre prior to Lund's employment, which had a generally V-shaped opening and a locking mechanism operated by a dog and a cam.

116. Neither the self-locking hitch itself, or any element of it, is unique or unknown to the public. Lund and Horner, the present shop superintendent of Flaherty, both testified that similar hitches were used on vehicles, especially those used by the army, as far back as 1936, the only difference being that such hitches lacked provision for pivoting in a vertical direction. All types of hitches for chipspreaders have means for vertical movement and the employment of such means on the hitch in question requires nothing more than simple mechanical skill.

117. The hitch here in question is also substantially identical to a number of hitches shown in the catalog of the Holland Hitch Company, the catalog pictures depicting the entire unit and the key operating elements and indicating that detailed drawings are available to anyone upon request.

118. An individual skilled in the hitch art could have developed a hitch identical to the experimental hitch made by Lund for Flaherty, Inc. simply upon being shown the picture of the hitch in the Flaherty brochure (see Finding 27).

119. V-shaped self-locking hitches may vary in exact detail, such as the location of the locking cam in the upper half of lower half of the hitch jaw or the rotation of the locking cam in a clockwise or counter-clockwise direction, however such variations do not import any novelty or mechanical advantage to the hitch.

120. The hitches shown in the Holland Hitch Company catalog are or easily can be controlled from a remote position on the vehicle to which they are affixed. Provision of means for this result requires ordinary mechanical skill and the method of achieving the result is obvious and not unique.

121. The fact that the art of making self-locking hitches is well known is evidenced by the ability of an Etnyre employee to make an actual hitch for the Etnyre chipspreader prototype simply by referring to the crude sketch which Lund had drawn in Toronto.

122. The fact that Flaherty, Inc. freely distributed brochures depicting the hitch while it was still in development further confirms the fact that no one considered the hitch design to be a trade secret until the commencement of this action, some eight years after it had been produced.

123. The record does not reveal the existence of any trade secrets with respect to the art of chipspreader construction and particularly with respect to the design of gates for a chipspreading machine. The general construction and specifications of the Flaherty chipspreader are revealed by examination of the machine and reading of the background information in the patent specification and publications issued by Flaherty. All of the elements of the machine, singly and in combination, are well known in the art.

124. In particular, gate assembly elements (c), (d), (f) and (i) as set out in Finding 113, are obvious to anyone examining the Flaherty chipspreader and are simple to design. The construction is not substantially different from that disclosed to the public in the prior art and its use in a chipspreader does not import any competitive advantage to the manufacturer. In addition, elements (e) and (g), set out in the same finding, are not found in the Etnyre machine and there is no evidence that they were appropriated by Lund or that they were unique to and secret in the Flaherty construction.

125. The mounting of the radial gate to assure positive shut-off by having the gates pivot inwardly from a closed position is not unique or secret (see, e. g., Davis) and was never employed by Flaherty, Inc. Koehring's contention that it is a trade secret is based on its belief that this design should have been disclosed to Flaherty, Inc. by Lund and that it would have thereby become the exclusive property of Flaherty, Inc. This belief will be discussed further later.

126. The renewable, reversible wearing edge (Elements (a) and (b) in Finding 113) were matters of public knowledge prior to the Flaherty chipspreader, having been used in grading machines, and any knowledge with respect to the use of such a construction on a chipspreader was acquired by Lund when he employed a renewable, reversible wearing edge on the Pickett and Nelson chipspreader, prior to his employment by Flaherty, Inc.

127. There is some suggestion in the record that during 1959, Flaherty, Inc. was faced with a problem regarding gate edge wear. Lund could not say absolutely that he had suggested use of a renewable, reversible edge as a solution. The record does reveal that the discussion of the problem generally focused on the possibility of hardening the gate edges. Assuming, arguendo, that Lund did not suggest the use of a renewable, reversible wearing edge (a fact by no means shown by the preponderance of the evidence in

this record), there is not one iota of evidence to suggest that this suggestion was purposely withheld by Lund to gain an advantage in future competition with Flaherty, Inc. The evidence indicates that other Flaherty employees were equally aware of the use of such edges in the construction industry. Moreover, the relative unimportance of this entire matter is demonstrated by the fact that Flaherty has never employed such wear edges in its construction following introduction of the feature by Etnyre, notwithstanding the fact that its possible adaptation in the Flaherty machine would be obvious to anyone and no bar to Flaherty's use of the device exists.

128. The knowledge employed by Lund in the development of the Etnyre chipspreader was in all cases general knowledge of the art of chipspreader construction and allied fields. In the main it was acquired by Lund prior to his employment by Flaherty, Inc. and was refined by the four and one-half years of general experience acquired during his employment by Flaherty. In general, the specific components designed by Lund are not copies of or interchangeable with Flaherty components.

129. The 20–25 crude sketches drawn by Lund in Toronto shortly after leaving Flaherty, Inc. were products of Lund's general knowledge acquired as noted above. Lund testified that the specifics revealed in these drawings were thought of while en route to Toronto, and that while he had various design alternatives in mind while still in Flaherty's employ, he had not then focused on any specific design.

130. Koehring asks the Court to infer that Lund had developed these designs while employed by Flaherty, Inc. Its sole basis for this inference is the proximity in time between Lund's resignation from Flaherty, Inc. and the dates of the sketches. No other basis for this inference has been introduced and Koehring does not deny that Lund's activities toward the end of his employment by Flaherty concerned the Flaherty Broom-Master rather than the chipspreader.

131. Koehring has not shown by a preponderance of the evidence that Lund developed the designs revealed in the sketches while still at Flaherty, Inc. However, even if this contention were assumed to have been demonstrated, there is no basis for asserting that Lund was obligated to disclose such information to Koehring and/or that if he had done so Koehring would be able to assert a property right in such information to the exclusion of all others including Lund.

132. The KOEHRING COMPANY INVENTIONS AND TRADE SECRETS AGREEMENT obligates Lund to disclose improvements, discoveries or inventions conceived, developed or acquired while in the service of the company. The designs revealed in the sketches were not developed while working on any project for Flaherty, Inc. They are not improvements, discoveries or inventions, but merely rough ideas of alternatives obvious to any individual familiar with road construction and chipspreader equipment. They were never developed to the extent that they constituted material subject to the agreement nor did Lund have any obligation to refine his thoughts to such an extent while in Flaherty's employ, there being no evidence that the design alternatives were in any way relevant to the work in which Lund was engaged or that they bore on some problem then confronting Flaherty.

133. Koehring's position with regard to the 20–25 sketches is tantamount to an assertion that an employee, upon terminating his employment, must search his mind for all thoughts relating to the business of his employer and set these down for the employer's reference and that thereafter, he is forever precluded from employing such thoughts in a competitive enterprise, notwithstanding the fact that such ideas come from his general knowledge and are in no sense secret or unique. The absence of merit in this assertion is patent.

134. Moreover, had Lund in fact presented Flaherty with all of the ideas he could develop before leaving its employ, he would not have been obligated to treat

them as confidential since they were not trade secrets in any sense and thus not subject to the INVENTIONS AND TRADE SECRETS AGREEMENT and, being the product of Lund's general knowledge and not a "complete development", appear to be excluded by Paragraph Four of that agreement. The only evidence introduced by Koehring tending to indicate that any of Lund's thoughts were unique is the fact that he described some elements of the Etnyre machine as "unique" when showing off the machine to Etnyre salesmen. This is no more than "sales talk," "unique" being used to emphasize the fact that the Flaherty chipspreader lacked such features. It does not lead to the conclusion that these features are unique in the art or would be protectible as Koehring's property and such a conclusion is impossible in view of the prior art discussed above.

135. There is no evidence in the record to sustain a finding that the Flaherty chipspreader did not represent Lund's best thoughts on chipspreader design as of January 15, 1960, the day he left the employ of Flaherty, Inc. The thoughts which Lund may then have had were merely alternative designs containing no basic improvements over the design then used by Flaherty.

136. Lund did not misappropriate any trade secrets from Flaherty, Inc. or Koehring by improperly using any specific information acquired while in Flaherty's employ nor did he engage in any act of unfair competition by failing to provide Flaherty with a full transcript of all thoughts relating to chipspreaders which occurred to him before leaving and thereafter using such thoughts as the basis for a competitive machine.

F. ALLEGED BREACH OF LUND'S COVENANT NOT TO COMPETE

137. Under Paragraph 7(f) of the Flaherty-Koehring Stock Exchange Agreement, Lund agreed not to participate or assist in a business or venture competitive with the business of Flaherty, Inc. as then constituted until September 1, 1962.

138. The business of Flaherty, Inc. consisted of the design and development of chipspreaders as well as their manufacture or sale.

139. While making design sketches for future reference in the event an opportunity to engage in the chipspreader business materialized may be considered "mere planning", the development of designs for a prototype, done in the context of a going commercial operation and under the assumption that, absent some major unforeseen development, such activity would lead to full-blown manufacturing and sales, cannot be deemed to be "mere planning".

140. Lund breached the covenant set out in the Stock Exchange Agreement on May 25, 1962, and thereafter until its expiration on September 1, 1962.

141. Etnyre was fully aware of the provisions of the Stock Exchange Agreement and while Etnyre (and Lund) acted on the basis of a professional opinion that development of a prototype was permitted under the agreement, they induced Lund's breach by instructing him to proceed. This conduct, however, does not in any way rise to the level of an illegal conspiracy as suggested by Koehring.

142. Some of Lund's conduct during the period May 25–September 1, 1962 is not in itself a breach of the no-competition agreement. Contacting probable suppliers to obtain cost estimates and similar activity is not conduct prohibited under the agreement as it did not require the employment of skills or information peculiarly in Lund's knowledge.

143. Koehring contends that Etnyre would have been unable to display the Etnyre chipspreader at the February, 1963 trade show had it waited until September 1, 1962 to begin design of the prototype. Accordingly, it submits that all 1963 sales of the Etnyre chipspreader are a proximate result of Lund's breach. This assertion is by no means clear, as considered in detail hereafter.

144. The Etnyre prototype was substantially completed at the end of October, 1962, or in approximately 160 days.

Koehring has made no attempt to introduce evidence indicating how many "work days" were actually involved, except to assert that Lund did substantial work on Saturdays and Sundays. Lund's 1962 diary, however, reveals that little work was done on Sundays and then only on a few specific days for short periods of time. Koehring has made no attempt to estimate the extent to which the 160 days used by Lund could (or could not) have been reduced.

145. Using Lund's actual work schedule, if the Etnyre prototype was first begun on September 1, 1962, it would have been completed on or about February 8, 1963, some two weeks before the February trade show. Etnyre would have been in a position to make a definite decision on production in the latter half of December, 1962.

146. Inasmuch as Etnyre was able to sell a substantial number of chipspreaders before the machine was even field tested in the spring of 1963, and, in fact, was able to sell one chipspreader in December, 1962, sight unseen, the evidence strongly indicates that the mere presence of the prototype at the trade show was sufficient to stimulate orders, particularly in view of the additional fact that several persons were encountering substantial difficulties with the Flaherty chipspreader's power unit during 1962, as noted in more detail later.

147. Koehring has not shown, by a preponderance of the evidence, that the sale of any Etnyre chipspreader was a proximate result of Lund's breach and there is substantial evidence suggesting that it was not.

148. The contract provision in question provides that Koehring shall be entitled to recover liquidated damages for its breach which shall not be less than the benefit and/or profit which Lund received for the acts constituting the breach.

149. The proper interpretation of the terms "benefit and/or profit" which Lund received would appear to be the salary for his work during the prohibited period. No evidence was introduced during the trial as to this amount.

150. The court will, however, assume that Lund's salary during this period was $9,000 per annum, said figure being stated in Etnyre's answers to Koehring's interrogatories.

151. Assuming a calendar year of 360 days, the salary paid to Lund for work between May 25 and September 1, 1962 is 99/360 of his annual salary or $2,475.-00.

## G. ALLEGED BREACH OF ETNYRE'S DUTY AS A FLAHERTY DISTRIBUTOR

152. Koehring asserts that Etnyre breached its duty as Flaherty's exclusive distributor by engaging in competition while remaining as a distributor and by failing to use its best efforts in 1962 to promote the sales of the Flaherty chipspreader.

153. While the relevant terms of the Flaherty, Inc.-Etnyre agreement require Etnyre to employ its best efforts in the sale of Flaherty chipspreaders, the "no competition" provision included therein, unlike that contained in the Lund-Koehring agreement, obligates Etnyre only to refrain from the manufacture and sale of competitive products and does not bar activity preparatory to sales competition.

154. Etnyre breached the "no competition" provision of its distributorship agreement on November 30, 1962 by offering an Etnyre chipspreader for rental or sale on May 1, 1963, which offer was accepted on December 17, 1962.

155. However, Koehring has stipulated that following the December 4, 1962 meeting between Gene P. Flaherty and Joseph McCoy of Etnyre, Flaherty decided to withhold exercise of the option to cancel the Etnyre distributorship and to await commercial reception of the new Etnyre machine, in the hopes that Etnyre would continue as a Flaherty distributor.

156. Flaherty, Inc. thereby waived its right to recover damages for sales of the Etnyre chipspreader after December 4, 1962, and for any losses which it might have incurred as a result of its decision

to refrain from acquiring new distributors after it had notice of Etnyre's competitive intentions.

157. Had Flaherty, Inc. not elected to waive its rights under the distributorship contract, it would have been possible to terminate the single solicitation evidenced by Etnyre's offer of November 30, 1962 and no damage to plaintiff would have resulted. By its conduct, Flaherty, Inc. evidenced its willingness to permit Etnyre to proceed with any attempts to market the Etnyre chipspreader.

158. Flaherty, Inc. could have terminated its distributorship agreement with Etnyre on October 22, 1962 when it first obtained confirmation of Etnyre's competitive plans from Etnyre, notwithstanding the fact that no solicitation, manufacture or sale had then occurred. This right arose from the general nature of the Flaherty-Etnyre relationship rather than from the express language of the contract. The fact that it did not do so, coupled with Gene P. Flaherty's decision of December 4, 1962, is evidence that, as of that time, Flaherty, Inc. was satisfied with Etnyre's performance as a distributor during 1962.

159. The basis for the present assertion that Etnyre did not use its best efforts in the sale of Flaherty chipspreaders in 1962 stems from Koehring's assertion that Etnyre's purchases of Flaherty chipspreaders for resale to customers dropped from 15 in 1961 to 3 in 1962.

160. The purchase figures used by Koehring are based on the calendar years 1961 and 1962, that is, from January 1 to December 31 of each year. While Etnyre, in preparing its brief, has assumed that the figures applied to the Koehring fiscal year December 1 to November 30, examination of the interrogatory in which this information is revealed shows that the figures are based upon calendar years and Etnyre's Exhibit 381, drawn from Etnyre's purchase and sales records also confirms this fact.

161. The use of calendar year purchase figures gives an erroneous picture of Etnyre's sales efforts because (a)

chipspreader sales are seasonal, the bulk of sales being concluded in the spring and summer; (b) Etnyre generally made purchases of chipspreaders in the late fall of the year, after the close of its fiscal year (October 1–September 30); and (c) sales efforts in the trade generally begin with the date of a trade show held in February of each year, such sale commitments often being fulfilled by delivery of machines purchased by the distributor in the calendar year just ended.

162. For the reasons stated above, use of the Etnyre fiscal year gives the most accurate representation of a distributor's sales efforts. Koehring's contention that the court need not consider inventory held for future sales is inaccurate, inasmuch as the exhibits before the court indicate that at the start of Etnyre Fiscal Year 1961, Etnyre's inventory consisted of no new chipspreaders held for resale and five old machines apparently then being leased on a purchase option arrangement. Etnyre's proposed findings refer to an inventory of seven machines as of this date, however this calculation of inventory is inaccurate, being derived from calendar year purchase figures on one hand and Etnyre fiscal year sales figures on the other, without making any correction for the fact that the basis for computing each figure is different. The court's calculation is derived from the actual dates of purchase and sale shown on Etnyre's records and is, therefore, accurate.

163. In its fiscal year 1961, Etnyre purchased 12 Flaherty chipspreaders. In fiscal year 1962, it purchased 8 chipspreaders.

164. In its fiscal year 1961, Etnyre sold 15 Flaherty chipspreaders. In fiscal year 1962, it sold 6 chipspreaders. In October and November of 1962, being the first two months of fiscal year 1963, Etnyre sold 3 chipspreaders, leaving it with one Flaherty chipspreader in stock which was sold on April 30, 1963.

165. Inasmuch as it generally requires two to three months sales effort to sell a chipspreader, the sale of three Flaherty chipspreaders in October and

November of 1962, two of which were new machines·purchased from Flaherty on May 25, 1962, evidences a continuing sales effort by Etnyre through the entire 1962 chipspreader selling season.

166. The figures set out above must also be examined in light of the fact that in fiscal 1961 Etnyre sold 3 new chipspreaders in its "Eastern territory", while selling no machines in this area in fiscal 1962 and only 1 machine in this area in November, 1962 which machine was a 1960 model apparently originally delivered on a lease basis.

167. The "Eastern territory" has historically been and continues to be a poor sales area, as evidenced by the fact that with regard to Etnyre's sales of its own chipspreaders as to which no question of "best efforts" exists, "Eastern territory" sales accounted for only 6 of 35 sales in fiscal 1963; 1 of 51 sales in fiscal 1964; and 2 of 54 sales in fiscal 1965.

168. When the unusual item of 1961 "Eastern territory" sales is eliminated, the evidence shows that Etnyre purchased 9 new Flaherty chipspreaders in fiscal 1961 and 8 new Flaherty units in 1962, a decrease of only one, and that it sold all but one of these machines during the same period, the lone unit remaining having been sold on April 30, 1963.

169. In addition, the evidence undisputably shows that purchasers of Flaherty chipspreaders produced after August, 1961 (Model 5MD) encountered serious operation difficulties with the transmissions in the Minneapolis-Moline tractor power units of Flaherty chipspreaders. Warren Shetter, Etnyre's sales manager, testified that it was extremely difficult to make sales in 1962 due to these mechanical failures and was able to point to two specific instances in which the mechanical difficulties with the Flaherty chipspreader were contributing factors to lost sales.

170. Total chipspreader sales by Flaherty, Inc. in its fiscal year 1962 amounted to 94 machines as compared with 110, 108, 124, 133 and 122 in prior years. While these figures cannot be directly compared to Etnyre sales because of the difference in accounting periods, it is clear from the evidence that Flaherty sales took a downward turn in the period here under consideration and that this change cannot be ascribed to any failing of Etnyre.

171. Koehring has not demonstrated that Etnyre failed to use its best efforts in the sale of Flaherty chipspreaders during 1962 and in fact, Etnyre has shown, by a preponderance of the evidence, that any such assertion is factually incorrect.

172. Koehring has not demonstrated that its reduction in sales and profits in 1962 or 1963 were in any sense a proximate result of improper conduct by Etnyre.

## CONCLUSIONS OF LAW

1. This court has jurisdiction to adjudicate all claims presented by the instant proceeding, jurisdiction over defendant Harold Lund being exercised pursuant to 28 U.S.C. § 1332 and jurisdiction over defendant E. D. Etnyre & Co., Inc. being exercised pursuant to 28 U.S.C. §§ 1332 and 1338.

2. A person who did not actually invent the subject matter sought to be patented is not entitled to a patent, 35 U.S.C. § 102.

3. A patent which is issued to a person who did not invent the subject matter sought to be patented or to his assignee is unauthorized by law and is void, conferring no rights against the public. Kennedy v. Hazelton, 128 U.S. 667, 9 S.Ct. 202, 32 L.Ed. 576 (1888); City of Milwaukee v. Activated Sludge, 69 F.2d 577 (7 Cir. 1934).

4. The statutory requirement as to inventorship cannot be waived and the patent cannot be validated by a subsequent assignment to the rightful inventor. Lorenz v. Berkline Corporation, 215 F.Supp. 869 (N.D.Ill.1963). Accordingly, the fact that the rightful inventor would have been obligated to assign the patent to the same company as now claims ownership by assignment from the

person wrongfully claiming the invention does not cure the invalidity of the patent.

■ 5. The statutory requirement as to inventorship applies in all instances and does not require a showing that the applicant's false claim of invention was designed to obtain a patent by fraud or deception. The principle of "bona fide mistake" evidenced in 35 U.S.C. §§ 116 and 256, is applicable only where all co-inventors were not joined or one wrong inventor was named among other actual inventors.

■ 6. Koehring is unable to avail itself of the corrective provisions of the statute relating to the omission of a co-inventor, inasmuch as the court has found that Harold Lund was the sole and actual inventor of the subject matter of the patent in suit and Gene P. Flaherty, the alleged inventor, has no claim to inventorship whatsoever.

■ 7. The principles relating to inventorship as between employers and employees, as discussed in Agawam Woolen Company v. Jordan, 7 Wall. 583, 74 U.S. 583, 19 L.Ed. 177 (1868), Pointer v. Six Wheel Corporation, 177 F.2d 153 (9 Cir. 1949) and City of Milwaukee v. Activated Sludge, supra, are inapplicable to the case at bar, inasmuch as there is no evidence that Gene P. Flaherty discovered any improved principle or had any preconceived design or that the developments made by Harold Lund were ancillary to anything conceived by Flaherty. Rather, Etnyre has proved by a preponderance of the evidence that the subject matter of the patent in suit was conceived, designed and developed by Lund exclusively and the court has so found.

■ 8. Neither Etnyre nor Lund is estopped from asserting Lund's claim of inventorship of the patent in suit. Diversey Corporation v. Mertz, 13 F.Supp. 410 (N.D.Ill.1936) and Barr Car Co. v. Chicago & N. W. Ry. Co., 110 F. 972 (7 Cir. 1901) are inapplicable to the case at bar, the evidence showing that Lund claimed inventorship publicly prior to the issuance of the patent and prior to leaving the employ of Flaherty, Inc. and that his claim is confirmed by the testimony of others.

■ 9. An individual is not estopped from asserting a claim when, after initially asserting his position, he fails continually to repeat his assertion in circumstances where he clearly knows that the act of repeating his claim will be useless, so long as he does no act which would indicate that he has waived his claim. The court has found that Lund did not waive his claim when executing the Flaherty-Koehring Stock Exchange Agreement and that under the circumstances, there was no occasion to reassert his claim of inventorship.

■ 10. United States Patent No. 3,086,684 is void.

■ 11. A presumption of validity attaches to a patent upon issuance by the Patent Office and this presumption of novelty and invention is strengthened where the alleged invalidity is based upon patents which were before the Patent Office and were rejected as anticipation of the invention. Nasco, Inc. v. Vision-Wrap, Inc., 352 F.2d 905 (7 Cir. 1965).

12. However, the presumption of validity is weakened and may be overcome by a showing that important portions of the prior art were not considered by the Patent Office. Dole Refrigerating Company v. Amerio Contact Plate Freezers, Inc., 265 F.2d 627 (3 Cir. 1959).

■ 13. Claims 4 and 6 of the patent in suit do no more than define a combination of old well-known elements. The combination does not exceed the sum of its parts, no additional or unexpected function resulting. Claims 4 and 6 of the patent in suit do not disclose a patentable invention meeting the requirements of 35 U.S.C. § 103 and judicial decisions thereunder. Lincoln Engineering Co. of Illinois v. Stewart-Warner Corp., 303 U.S. 545, 549, 58 S.Ct. 662, 82 L.Ed. 1008 (1938); Great A. & P. Tea Co. v. Supermarket Equipment Corp., 340 U.S. 147, 152, 71 S.Ct. 127, 95 L.Ed. 162 (1950).

14. The subject matter of a claimed invention may be unpatentable over the prior art notwithstanding the fact that all elements of any claim are not combined in one particular prior art reference and notwithstanding the fact that no one prior patent or publication teaches the exact specific form of device disclosed in the claim, if the alleged improvement is taught by the prior art taken as a whole. General Time Corp. v. Hansen Manufacturing Company, 199 F. 2d 259, 264 (7 Cir. 1952).

15. The subject matter of a claimed invention may be obvious and unpatentable over the prior art notwithstanding the fact that the combination of prior art references does not precisely duplicate the patented article. It is sufficient that the combination described in the patent is obvious from the disclosures of the prior art. Akron Brass Co. v. Elkhart Brass Mfg. Co., 353 F.2d 704 (7 Cir. 1965).

16. A person skilled in the art would, in view of the prior art as introduced in evidence in this proceeding, be able to design the improvement claimed in Claims 4 and 6 of the patent in suit.

17. Claims 4 and 6 of United States Patent No. 3,086,684 are invalid.

18. Koehring, accordingly, is not entitled to maintain an action against Etnyre for the alleged infringement of Claims 4 and 6 of the patent in suit and judgment on the action of alleged infringement must be entered for Etnyre and against Koehring.

19. An action for misappropriation of trade secrets cannot be obtained absent proof the knowedge allegedly misappropriated is in fact a trade secret. Koehring has not proven the existence of any trade secret and Etnyre and Lund have demonstrated, by a preponderance of the evidence, that no such secrets exist with respect to the construction and devices involved in this action.

20. Matters of public knowledge or of general knowledge in an industry cannot be claimed by any person as a secret. Information which is completely disclosed by the goods which one markets and involving no secret technique in assembly or know-how cannot be claimed as a secret. Skoog v. McCray, 211 F.2d 254 (7 Cir. 1954).

21. While matters which are in the realm of trade secrets need not amount to invention in the patent law sense, they must at least amount to discovery, Smith v. Dravo, 203 F.2d 369 (7 Cir. 1953). However, proof of experimentation in the development of a device is no indication of discovery when the experimentation involves no new, different or secret method and the end result is placed before the public who are then able to duplicate the result from mere examination of the product. The knowledge gained through experimentation is placed in the public domain when the end result is made public and that which has become public property cannot be recalled to privacy. Smith v. Dravo, supra, at 373.

22. While the owner of a trade secret may assert his rights against one who acquired the information unlawfully notwithstanding the fact that the idea was in the public domain when it was used, Grepke v. General Electric Co., 280 F.2d 508, 512 (7 Cir. 1960), or the fact that it could have been discovered lawfully, Smith v. Dravo, supra, 203 F.2d at 375, such principles are inapplicable if the matter learned was not secret at the time it was obtained because it had already been disclosed to the public. Skoog v. McCray Refrigerator Co., supra. This latter principle is also applicable even if the alleged owner has not disclosed his "trade secret" to the general public if the information is simply the already well-known result of applying general knowledge. While the public may not be aware of the application of general knowledge to a particular device until it is publicly exhibited and the device is "secret" in that sense, the device itself is not a trade secret and an individual whose general knowledge has increased while engaged in the development of the device is free to use such knowledge in duplicating the device. See Sperry Rand

v. Rothlein, 241 F.Supp. 549 (D.Conn. 1964). An employer's decision not to introduce a particular device to the public does not convert a simple device into a trade secret if the device itself, by reason of its construction and development, is not secret.

23. Following the termination of his employment, an employee may not be prevented from using the skills and general knowledge he has acquired prior to and during his employment. Schulenburg v. Signatrol, Inc., 33 Ill.2d 379, 212 N.E.2d 865 (1965).

24. An employee owes no obligation to his employer to present the employer, upon termination of the relationship, with a comprehensive list of ideas, drawn from his general knowledge, which might be valuable in the business of the employer.

25. An employee may fulfill his duty of undivided loyalty to his employer while at the same time retaining various ideas in his mind, if the ideas he retains are not withheld for the purpose of gaining a competitive advantage over his employer at a later date and the particular employment activity he is engaged in does not require the use of those particular ideas in order to bring his work to a successful completion.

26. An agreement requiring an employee to disclose all improvements, discoveries and inventions developed by him while employed and specifying that such matter becomes the property of the employer does not give an employer a mortgage on all thoughts occurring to the employee, but is limited to those ideas which are not mere alternatives drawn from the employee's general knowledge, but can in fact be deemed an improvement, discovery or invention and are sufficiently concrete to be considered a "development" or "conception". Ideas which are disclosed to an employer but do meet these standards do not become the property of the employer.

27. Lund's conduct following execution of the KOEHRING COMPANY INVENTIONS AND TRADE SECRETS AGREEMENT and during the period of his employment by Flaherty, Inc. was fully consistent with his duty of loyalty to his employer and his obligations under the contract.

28. Koehring is not entitled to recover anything from Lund and/or Etnyre for the alleged misappropriation of trade secrets or acts of unfair competition claimed in its complaint.

29. The covenant not to compete contained in the Flaherty-Koehring Stock Exchange Agreement, obligating Lund to refrain from competition until September 1, 1962, is a reasonable restraint and is valid.

30. A contract prohibiting participation in a business competitive with the business of an employer, refers to all phases of that business, including engineering and design, when such is performed in connection with an already-established commercial enterprise.

31. Lund breached the provisions of this agreement on May 25, 1962, and thereafter up to September 1, 1962 when it expired, and is responsible for the damages proximately resulting therefrom, or, in the event such damages cannot be calculated with certainty, is obligated to Koehring in the amount of the benefit he received for the acts constituting the violation, as provided in said agreement.

32. Etnyre, having had knowledge of Lund's obligation and having instructed Lund to perform the acts constituting a breach of his contract, is obligated jointly and severally with Lund for the amount recoverable by Koehring under the agreement.

33. Damages claimed as a result of a breach of a covenant not to compete must be proved with a high degree of certainty, both as to amount and as to their proximate relation to the acts constituting a breach of the covenant. See Lufkin's Real Estate, Inc. v. Aseph, 349 Mass. 343, 208 N.E.2d 209 (1965).

34. As detailed by the court in its findings of fact, Koehring has not

proved any consequential damages resulting from Lund's breach, both as to amount and as to their proximate relationship to Lund's conduct. Accordingly, Koehring is remitted to the liquidated damages provision of the agreement.

35. The benefit or profit accruing to Lund for the acts constituting the breach of the covenant, as found by the court, is $2,475.00.

36. Koehring is entitled to recover from Lund and Etnyre, jointly and severally, the sum of $2,475.00.

37. In accepting the benefits of the exclusive distributorship contracts executed by Flaherty, Inc. and by other conduct evidencing assent to its terms, Etnyre bound itself to the performance of the obligations stated in said contracts notwithstanding its failure to execute formally the documents.

38. Enforcement of the provision of said distributorship contracts prohibiting competition in the five years following termination of the relationship is not sought by Koehring and is acknowledged by Koehring to be unenforceable as a part of the distributorship contract.

39. The obligation of Etnyre to refrain from the manufacture and sale of products in competition with Flaherty, Inc. was waived by Flaherty, Inc. on December 4, 1962 and any and all damage which might have been incurred from the breach of this obligation prior to December 4, 1962 having been shown to have been avoidable absent such a waiver Koehring cannot recover damages for the alleged breach of said obligation.

40. Koehring has not sustained the burden of proving its contentions that Etnyre failed to use its best efforts in the promotion and sale of Flaherty chipspreaders as required by the distributorship contract and, as found by the court, said contention is inaccurate. Accordingly, Koehring cannot recover damages from Etnyre based on this alleged breach.

41. The complaint in this action being stated in one count, all allegations of patent infringement, misappropriation of trade secrets and breach of contracts being combined therein, and the court having determined the merits of each issue as above, Koehring Company is entitled to recover from E. D. Etnyre & Co. and Harold Lund, jointly and severally, the sum of $2,475.00 without costs.